Opinion
 

 WISEMAN,J.
 

 In this case, we review an order dismissing a case following a grant of a motion for summary judgment. In doing so, we address the meaning of the term “mental disability” as defined under Government Code section 12940, the Fair Employment and Housing Act (FEHA). For some reason, the Legislature imposed a requirement that a physical disability must limit a major life activity without imposing the same requirement for a mental disability. Although we question the wisdom of making it harder for a person who has suffered a physical disability to come within the FEHA than a person suffering a mental disability, we do not substitute our judgment for that of the Legislature. Consequently, we conclude plaintiff (who suffers from a reading disorder) has raised a triable issue of fact regarding whether he suffered from a disability under the FEHA.
 

 However, this finding does not end our inquiry since plaintiff must also show his employer had knowledge of his mental disability. The question then becomes: Is it enough that an employer be aware of deficiencies in an employee’s performance which are the result of a mental deficiency
 
 or
 
 must an employer have actual knowledge that the employee suffers from a specific mental disability? We conclude that in order to meet the knowledge requirement of the FEHA, an employer must have actual knowledge an employee suffers from a specific disability. In this case, plaintiff never told his employer he had a learning disability. Plaintiff’s nonspecific complaints of “trouble” or “problems” with reading or writing coupled with his job performance difficulties are not sufficient to charge his employer with
 
 *713
 
 knowledge that he suffers from a mental disability as defined by the FEHA. As a result, we conclude the trial court properly granted the employer’s motion for summary adjudication with respect to plaintiff’s first cause of action for tortious termination.
 

 In the unpublished portion of this opinion, we address the trial court’s order granting the employer’s motion for summary adjudication with respect to plaintiff’s second (breach of implied-in-fact contract), third (breach of implied covenant of good faith and fair dealing) and fourth (breach of oral contract) causes of action. In doing so, we find the trial court erred, and reverse.
 

 Procedural History
 

 Edward J. Pensinger, Jr. (plaintiff) filed a complaint in the Superior Court of Tulare County against Bowsmith, Inc., Allan Smith, Davis Olney and Does 1 through 10 (Bowsmith). Plaintiff alleged four causes of action: (1) tortious termination in violation of public policy; (2) breach of implied contract; (3) breach of implied covenant of good faith and fair dealing; and (4) breach of oral contract. Bowsmith filed a demurrer to the complaint and plaintiff filed a first amended complaint which alleged five causes of action: the four originally pled and a fifth alleging intentional interference with prospective economic advantage. Bowsmith filed a cross-complaint alleging five causes of action: (1) misappropriation of trade secrets; (2) unfair business practice; (3) intentional interference with economic advantage; (4) trade libel; and (5) defamation.
 

 Plaintiff subsequently requested dismissal without prejudice of Allan Smith and Dave Olney with respect to the interference claim, and Allan Smith with respect to the alter ego claim of the first amended complaint. The request was granted by the trial court. Bowsmith filed two motions for summary adjudication. The first was for summary adjudication of plaintiff’s first cause of action alleging tortious termination in violation of public policy. The second was for summary adjudication of the second, third, and fourth causes of action. The two motions were heard together. The trial court granted both motions, and entered judgment pursuant to Code of Civil Procedure section 437c, subdivision (c).
 
 [1]
 
 Plaintiff and Bowsmith stipulated to dismissal of plaintiff’s fifth cause of action and Bowsmith’s cross-complaint without prejudice.
 

 Plaintiff filed a timely appeal raising six contentions: (1) there was a triable issue of fact concerning whether defendant was a disabled person
 
 *714
 
 within the meaning of the FEHA; (2) the trial court erred in finding there was no evidence Bowsmith was aware of plaintiff’s disability; (3) there was a triable issue of fact concerning plaintiff’s qualifications to continue doing his job; (4) the trial court erred in concluding there was no evidence Bowsmith’s reasons for discharging plaintiff were pretextual; (5) the trial court erred in finding there was no evidence to rebut the presumption that plaintiff’s employment was “at will”; and (6) the action for breach of an implied covenant of good faith and fair dealing survives because there was a contract for employment requiring good cause for termination.
 

 Factual History
 

 Plaintiff attended school in Bakersfield. He claims he had great difficulty reading and writing throughout elementary school and that his parents hired tutors to assist him. Upon completion of eighth grade, there was a debate about whether he would be allowed to attend high school because of his reading problems and his poor performance on an examination. It was only after the test was given to him orally that plaintiff was allowed to attend high school. While in high school, plaintiff continued to have problems reading and writing and took a noncollege-preparatory curriculum of courses. Plaintiff graduated from high school and began to attend junior college. However, he was unable to keep up with the course work and discontinued the academic classes. He did continue to take vocational courses such as welding and mechanics, in the evening.
 

 After high school, plaintiff held several jobs, including working as a welder and mechanic. He also worked as a distributor of irrigation equipment, selling, delivering, and installing the systems. The irrigation systems he sold included products produced by Bowsmith.
 

 Plaintiff began working exclusively for Bowsmith in August 1982 as a sales representative. When he started work, he shared the responsibility for sale of Bowsmith products in California with a coworker, Darrell Willbanks. When Willbanks was terminated in 1984, plaintiff assumed responsibility for the entire sales territory of California. Plaintiff’s supervisor from 1982 to 1985 was the sales and marketing manager, Stan Hawkins. While Hawkins was his supervisor, plaintiff was required to make written “call reports.” Plaintiff claims that because of his difficulty in reading and writing, Hawkins permitted him to provide the information for the call reports orally rather than in writing. After Hawkins left Bowsmith, Allan Smith, the company’s chief executive officer, told plaintiff to report directly to him. Plaintiff claims he orally provided information directly to Smith or someone on the inside sales staff from the time Hawkins left until July 1993.
 

 
 *715
 
 Plaintiff claims that from the time Hawkins left until approximately 1992, his relationship with Bowsmith was very good and he was given responsibility for additional sales territories in the Pacific Northwest. Plaintiff claims that during this period, Smith promised on more than one occasion, that plaintiff would have a job at Bowsmith for as long as he wished, so long as he “kept his nose clean.” However, in 1992, plaintiff claims a dispute arose between Smith and him over whether plaintiff should be paid a commission for a sale he negotiated. Although Smith ultimately paid him the commission, plaintiff claims that Smith’s attitude toward him changed from that point on. It was after this incident that Smith informed plaintiff he believed Bowsmith needed a sales and marketing manager.
 

 Plaintiff did tell Smith he had a problem with reading and writing. However, plaintiff never said he was disabled and Smith claims he did not know the extent of plaintiff’s problem. Smith claims it was not until 1992 or 1993, when he began to insist plaintiff submit written call reports, that he learned the extent of plaintiff’s problem. However, Smith did provide plaintiff a tape recorder so he could dictate his reports and then have them transcribed by Smith’s sister-in-law. Plaintiff claims he dictated two tapes and submitted them for transcription, but only saw the transcript of one of the tapes and it was unintelligible. Plaintiff claims he was never told what happened to the two tapes or their transcripts. He alleges Smith never provided him any feedback on the transcriptions or requested he continue to dictate the reports. However, in May 1993, Smith purportedly sent plaintiff a memorandum stating that plaintiff had submitted only one tape for transcription and then would not allow the transcription to be given to Smith. Plaintiff claims he never saw the memorandum.
 

 Sometime in 1993, before Davis Olney was hired, Smith requested plaintiff have tests conducted to determine the extent of his reading and writing problem. Smith claims the purpose of the request was to determine what could be done to help plaintiff with his problem. Plaintiff states he was never told this was the purpose of the test and was first approached about being tested by Smith’s attorney. Plaintiff claims this caused him to fear that the purpose of the testing was to provide a basis for terminating his employment. Although plaintiff said he would comply with the request, he was never evaluated while he worked for Bowsmith.
 

 In July 1993, Olney was hired as sales and marketing manager for Bowsmith. Sometime after he assumed his position, Olney began requiring plaintiff to submit written call reports, as well as other written reports. These reports were required of all Bowsmith sales personnel. Plaintiff informed
 
 *716
 
 Olney it was taking a lot of time to complete the reports and Olney claims that as a result, he reduced the amount of documentation plaintiff was required to submit. However, Olney contends plaintiff never told him he had a “learning disability.” Plaintiff asserts there was no reduction in the reports he had to submit and in November or December 1993, he met with Smith to inform him of the problems he was having in complying with Olney’s demand for reports. Plaintiff claims that during this meeting, which his wife also attended, Smith indicated he understood plaintiff’s difficulties with reading and writing, promised he would speak to Olney about it, and authorized plaintiff’s wife to fill out the daily call reports for him. Plaintiff also points out Smith said any additional information required by Olney could be submitted by plaintiff orally during their daily telephone conversations.
 

 Olney and Smith take the position that plaintiff failed to provide the information they required despite their repeated requests to him. Olney states he informed plaintiff of the problem during a meeting in November 1993, and in two written memoranda prepared in December 1993. Based on Olney’s recommendation, Smith notified plaintiff on April 21, 1994, that his employment with Bowsmith was terminated. When Smith notified plaintiff he was terminating his employment, plaintiff’s difficulty with reading and writing was not discussed. Plaintiff only recalls Smith saying something to the effect that “things were not working out,” and the company was “going in a different direction.” Smith claims the reason plaintiff was terminated was because he did not provide the information required by Bowsmith in order to increase its share of the market for irrigation equipment, and that he refused to cooperate with Olney in this endeavor.
 

 In approximately November 1995, plaintiff was evaluated by an educational psychologist and diagnosed as suffering from a disability classified in the Diagnostic and Statistical Manual of Mental Disorders (3d ed. rev.) (DSM-HI-R) as 315.00, “Developmental Reading Disorder.” There is no evidence that prior to this evaluation, defendant was ever formally diagnosed as suffering from a learning disability.
 

 Bowsmith maintained an employment manual, a copy of which was provided to plaintiff, which states: “All of the Company’s employees are employed as employees at-will of the Company. Any other term of employment or any other type of employment will require a written agreement signed by the President of the Company.” From the record, it is not clear when this manual was first implemented, although Bowsmith states the version included in the record was written in 1993.
 

 
 *717
 
 Discussion
 

 I.
 
 Plaintiffs disability and the FEHA
 

 Plaintiff contends the trial court erred in granting summary adjudication with respect to his first cause of action because there were triable issues of fact on all four of the elements of his cause of action for tortious termination. He argues that contrary to the trial court’s finding, there was evidence presented he suffers from a “mental disability” as defined under Government Code section 12940, the FEHA. Further, he claims there was evidence presented that Bowsmith was aware of this disability and terminated his employment because of it. Finally, plaintiff asserts there was a triable issue of fact regarding whether he was qualified to perform the tasks required of his job and that Bowsmith’s claim that he could not was pretextual. Since he is unable to establish a triable issue of fact for each of the elements of his cause of action, plaintiff’s argument must fail.
 

 A.
 
 Standard of review
 

 When reviewing a motion for summary judgment on appeal, this court determines de novo “whether an issue of material fact exists and whether the moving party was entitled to summary judgment as a matter of law.”
 
 (Brantley
 
 v.
 
 Pisaro
 
 (1996) 42 Cal.App.4th 1591, 1601 [50 Cal.Rptr.2d 431].) In other words: “In reviewing an order granting summary judgment, we must assume the role of the trial court and redetermine the merits of the motion. In doing so, we must strictly scrutinize the moving party’s papers. [Citation.] The declarations of the party opposing summary judgment, however, are liberally construed to determine the existence of triable issues of fact. [Citation.] All doubts as to whether any material, triable issues of fact exist are to be resolved in favor of the party opposing summary judgment.
 
 (Ibid.)” (Martinez
 
 v.
 
 County of Los Angeles
 
 (1996) 47 Cal.App.4th 334, 341 [54 Cal.Rptr.2d 772].) Our review is limited, as is the trial court’s, to determining if “there is evidence requiring the fact-weighing procedures of a trial. [Citation.]”
 
 (Frank and Freedus
 
 v.
 
 Allstate Ins. Co.
 
 (1996) 45 Cal.App.4th 461, 468 [52 Cal.Rptr.2d 678].) We do not decide the merits of the issues themselves.
 
 (Ibid.)
 

 Review of a motion for summary judgment involves a three-step analysis: “Appellate review of summary judgment is limited to the facts contained in the documents presented to the trial court. This court exercises its independent judgment as to the legal effect of the undisputed facts disclosed by the parties’ papers. [Citations.] In so doing, we apply the same three-step analysis required of the trial court: We first identify the issues framed by the
 
 *718
 
 pleadings, since it is these allegations to which the motion must respond. Secondly, we determine whether the moving party has established facts which negate the opponents’ claim and justify a judgment in the movant’s favor. Finally, if the summary judgment motion prima facie justifies a judgment, we determine whether the opposition demonstrates the existence of a triable, material factual issue. [Citation.]”
 
 (Torres
 
 v.
 
 Reardon
 
 (1992) 3 Cal.App.4th 831, 836 [5 Cal.Rptr.2d 52].) A defendant may meet the burden of establishing a plaintiff’s cause of action has no merit in one of two ways. “A defendant or cross-defendant has met his or her burden of showing that a cause of action has no merit if that party has shown that
 
 one or more elements
 
 of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action.” (§ 437c, subd. (o)(2), italics added; see
 
 Brantley
 
 v.
 
 Pisaro, supra,
 
 42 Cal.App.4th at p. 1598.) With this standard firmly in mind, we consider the elements of plaintiff’s cause of action for tortious termination in violation of public policy.
 

 B.
 
 Termination because of “mental disability”
 

 “An action in tort seeking damages for discharge from employment in contravention of public policy is an exception to the general rule, now codified in Labor Code section 2922, that unless otherwise agreed by the parties, an employment is terminable at will.”
 
 (Jennings
 
 v.
 
 Marralle
 
 (1994) 8 Cal.4th 121, 129 [32 Cal.Rptr.2d 275, 876 P.2d 1074], fn. omitted.) However, in order to be actionable, the tortious termination must contravene fundamental public policy.
 
 (Gantt
 
 v.
 
 Sentry Insurance
 
 (1992) 1 Cal.4th 1083, 1094 [4 Cal.Rptr.2d 874, 824 P.2d 680].) Further, the fundamental public policy “must be found in either a constitutional or statutory provision; . . .”
 
 (Jennings
 
 v.
 
 Marralle, supra,
 
 8 Cal.4th at p. 130.)
 

 Plaintiff claims the fundamental public policy that was violated by his termination is found in the FEHA, which prohibits discrimination based on his mental disability.
 

 “It shall be an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California:
 

 “(a) For an employer, because of the race, religious creed, color, national origin, ancestry, physical disability,
 
 mental disability,
 
 medical condition, marital status, or sex of any person, to refuse to hire or employ the person or to refuse to select the person for a training program leading to employment,
 
 *719
 
 or to bar or to discharge the person from employment or from a training program leading to employment, or to discriminate against the person in compensation or in terms, conditions or privileges of employment.” (Gov. Code, § 12940, italics added.)
 

 Because the FEHA is modeled after the federal Rehabilitation Act of 1973 (29 U.S.C. § 701 et seq.) and the Americans with Disabilities Act (ADA) (42 U.S.C.A. § 12101 et seq.), interpretations of these laws are “particularly useful ‘to guide the construction’ ” of the California statute.
 
 (Cassista
 
 v.
 
 Community Foods, Inc.
 
 (1993) 5 Cal.4th 1050, 1063 [22 Cal.Rptr.2d 287, 856 P.2d 1143].) In order to prevail on a cause of action for wrongful termination in violation of Government Code section 12940, plaintiff had to prove: He is a disabled person, as defined in the FEHA; he is qualified to perform the duties of the position with or without reasonable accommodation; and that he was terminated because of his disability. (See Cal. Code Regs., tit. 2, §§ 7293.7 & 7293.9;
 
 White
 
 v.
 
 York Intern. Corp.
 
 (10th Cir. 1995) 45 F.3d 357, 360-361.)
 

 1.
 
 What is a “mental disability?”
 

 In granting the motion for summary judgment on plaintiff’s first cause of action, the trial court found no evidence had been presented that plaintiff suffered from a “disability protected by law.” In this regard, the court found that although plaintiff may have suffered from a reading disorder, “this disability does not rise to the level of disability protected by the Fair Employment and Housing Act or the Americans With Disabilities Act.” The court also found no evidence had been presented that Bowsmith knew plaintiff suffered from a “specific disability” during the time of his employment. The court held that “knowledge of Plaintiff’s shortcomings does not amount to knowledge of a specific disability.” Finally, the court found there was no evidence plaintiff was discharged for any reason “other than his job performance and failure to cooperate with directives of management.”
 

 The court did not explain why it believed plaintiff’s learning disorder did not constitute a “mental disability” as defined by the FEHA or the ADA. Bowsmith claims there are two bases for this conclusion. First, Bowsmith argues no admissible evidence was presented that plaintiff’s difficulty with reading and writing was not simply the result of “an inadequate education or simply a lower rate of intelligence . . . .” Second, Bowsmith claims the definition of a “mental disability” in the FEHA includes a requirement that the mental disability substantially limit a major life activity, and that plaintiff failed to present any evidence of this element. Considering the plain language of the FEHA, we reject these arguments.
 

 
 *720
 
 The FEHA was amended in 1992 to include “mental disability” as one of the prohibited bases for discrimination in employment. (Stats. 1992, ch. 913, § 23.1, p. 4313.) The term “mental disability” is defined for purposes of the FEHA, in Government Code section 12926, subdivision (i): “(i) ‘Mental disability’ includes any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and
 
 specific learning
 
 disabilities. However, ‘mental disability’ does not include conditions excluded from the federal definition of ‘disability’ pursuant to Section 511 of the Americans with Disabilities Act of 1990 (42 U.S.C., Sec. 12211). Additionally, for purposes of this part, the unlawful use of controlled substances or other drugs shall not be deemed, in and of itself, to constitute a mental disability.” (Italics added.) The term “physical disability” is defined in the same code section, but in a different subdivision, which provides, in pertinent part:
 

 “(k) ‘Physical disability’ includes, but is not limited to, all of the following:
 

 “(1) Having any physiological disease, disorder, condition, cosmetic disfigurement, or anatomical loss that does
 
 both of the following:
 

 “(A) Affects one or more of the following body systems: neurological, immunological, musculoskeletal, special sense organs, respiratory, including speech organs, cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, and endocrine.
 

 “(B) Limits an individual’s ability to participate in major life activities.” (Gov. Code, § 12926, subd. (k), italics added.)
 

 Initially, the only evidence plaintiff submitted that he suffered from a mental disability under the FEHA was a letter from a psychologist who tested him in 1995 and found plaintiff suffered from a “Developmental Reading Disorder” as defined by the DSM-III-R. Bowsmith is correct that this letter cannot be considered for purposes of resolving the motion for summary judgment. However, in response to Bowsmith’s motion for summary judgment, plaintiff submitted a declaration by the same psychologist along with his curriculum vitae, containing the same opinion.
 

 The FEHA does not define what constitutes a “specified learning disability.” That determination presents a mixed question of law and fact. However, “Reading Disorder” is defined in the section of the DSM entitled “Learning Disorders.” (Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994) pp. 46-48.) Thus, the declaration by plaintiff’s psychologist was some
 
 *721
 
 evidence plaintiff suffered from
 
 a
 
 learning disability. While a diagnosis under the DSM does not establish conclusively plaintiff suffered from a “learning disability” as contemplated by the FEHA, it is sufficient to raise a triable issue of fact concerning the existence of such a condition. Moreover, whether plaintiff’s disability qualified as a “learning disability" under the FEHA is a factual and legal determination which Bowsmith did not challenge. The real crux of Bowsmith’s argument is that it is not enough for plaintiff to have a diagnosis that he suffers from some learning disorder; he must also present evidence the disorder limits his ability to participate in a major life activity, in order for him to be considered as suffering from a mental disability as defined by the FEHA. Bowsmith’s argument is predicated on the assertion that the FEHA defines mental disability in the same manner as the ADA. However, this assertion is not supported by a comparison of both statutes. Unlike the FEHA, the ADA combines the definitions of both physical and mental disability in one section:
 

 “(2)
 
 Disability
 

 “The term ‘disability’ means, with respect to an individual—
 

 “(A)
 
 a physical or mental impairment
 
 that substantially limits one or more of the major life activities of such an individual;
 

 “(B) a record of such an impairment; or
 

 “(C) being regarded as having such an impairment.” (42 U.S.C.A. § 12102, italics added.)
 

 There is no doubt from this definition that establishing a mental disability for purposes of the ADA requires a plaintiff to prove that it “substantially limits one or more of the major life activities.” Although the FEHA includes this requirement with respect to proving a physical disability, it is absent from the definition of mental disability.
 

 Notwithstanding the fact the Legislature did not include the language requiring a limitation on a major life activity when it amended the FEHA to define the term “mental disability," Bowsmith claims this is what was intended. There are several problems with this argument. Bowsmith claims this intent is evident in the provisions of the California Code of Regulations, title 2, section 7293.5 et seq. However, there is nothing in those sections that indicates any intent to engraft the requirement of a limitation on a major life activity on the definition of mental disability. The regulations only refer to the definitions of mental disability and physical disability in Government Code section 12926. (Cal. Code Regs., tit. 2, § 7293.6.)
 

 Further, there is no basis for us to impose a requirement that a mental disability limit a major life activity, when the Legislature saw fit not to do
 
 *722
 
 so. “When the language is clear and unambiguous, there is no need for construction.”
 
 (People
 
 v.
 
 Woodhead
 
 (1987) 43 Cal.3d 1002, 1007-1008 [239 Cal.Rptr. 656, 741 P.2d 154].) Undoubtedly, the Legislature was aware of the definitions of mental and physical disability included in the ADA because it referred to it repeatedly in enacting the amendment to the FEHA. (See Stats. 1992, ch. 913, p. 4282 et seq.) Undoubtedly, the Legislature also knew how to amend the FEHA to include a requirement that a mental disability effect must limit a major life activity, if it wished that result. This is evident from the other provisions of California law which were amended in 1992 along with the FEHA; specifically, Business and Professions Code section 125.6; Civil Code section 54; Education Code section 44101; and Government Code section 11135. In each of these sections the Legislature amended the definition of “disability” to mirror that of the ADA, and include a requirement that the physical
 
 or mental
 
 disability “substantially limits one or more of the major life activities of the individual.” Yet, it did not include this requirement in the definition of mental disability under the FEHA.
 

 While we may question the wisdom of making the hurdle higher for a person who has suffered the loss of a limb to prove he or she suffers from a disability for purposes of the FEHA, than it is for a person who does not read well, we are not at liberty to ignore the plain language of the statute or supplant our judgment for that of the Legislature.
 
 (People
 
 v.
 
 Woodhead, supra,
 
 43 Cal.3d at p. 1007 [“Our analysis starts from the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent”].) It must be concluded from all the evidence that plaintiff did raise a triable issue of fact concerning whether he suffered from a disability as defined by the FEHA. However, the inquiry does not end there.
 

 2.
 
 Knowledge of the mental disability
 

 Assuming plaintiff suffered from a mental disability as defined by the FEHA, any claim he was wrongfully terminated because of that disability must be predicated upon evidence that Bowsmith knew of the disability.
 
 (Landefeld
 
 v.
 
 Marion General Hosp., Inc.
 
 (6th Cir. 1993) 994 F.2d 1178, 1181-1182.) Put simply, unless there is some evidence an employer knows an employee is suffering from a disability, it is impossible for an employee to claim he or she was discharged because of it or that an employer refused to accommodate the disability.
 

 “Before an employer must make accommodation for the physical or mental limitation of an employee, the employer must have knowledge that
 
 *723
 
 such a limitation exists. ... In general, ‘it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed.’ 29 C.F.R. app. § 1630.9.”
 
 (Miller
 
 v.
 
 National Cas. Co.
 
 (8th Cir. 1995) 61 F.3d 627, 629-630.)
 

 The evaluation of defendant conducted by a psychologist indicates he suffers from a specific learning disorder as defined by DSM-III-R. As discussed,
 
 supra,
 
 the definition of “mental disability” in the FEHA specifically includes learning disabilities. However, this diagnosis was not made until November 1995, almost 18 months after plaintiff was terminated by Bowsmith. There was no evidence presented that plaintiff was ever specifically diagnosed as suffering from a learning disorder prior to this date or that Bowsmith was made aware that plaintiff suffered from a learning disorder during the entire 12 years he was employed by them. In fact, while still employed by Bowsmith, plaintiff failed to comply with Bowsmith’s request that he be evaluated to determine the extent of his reading and writing problem.
 

 Bowsmith does not deny it was aware plaintiff had difficulty with reading or writing. However, Bowsmith claims knowledge of plaintiff’s shortcomings in these areas is not sufficient to establish it knew he suffered from a mental disability in the form of a learning disorder. Plaintiff, on the other hand, argues Bowsmith’s knowledge of his difficulty with reading or writing as well as its attempts to accommodate these deficiencies during the years of his employment is evidence it knew he suffered from a mental deficiency. Thus, the question in plaintiff’s case comes down to what constitutes “knowledge” of a mental disability for purposes of the protections of the FEHA. Is it enough that an employer be aware of deficiencies in an employee’s performance which are the result of a mental deficiency or must an employer actually have knowledge that the employee suffers from a specific mental disability? Since the FEHA was only amended in 1994 to include “mental disability” as one of the prohibited bases for discrimination, and there is a dearth of California law on what constitutes “knowledge” of a disability, we look to decisions of federal courts that have addressed the issue in the context of the ADA.
 

 The Seventh Circuit Court of Appeals recently addressed the issue of when an employer is deemed to know of an employee’s disability. “It is true that an employer will automatically know of many disabilities. For example, an employer would know that a person in a wheelchair, or with some other obvious physical limitation, had a disability. Furthermore, an employer may actually know of disabilities that are not immediately obvious: the employee may ask for an accommodation under the ADA, or he may inform the
 
 *724
 
 employer gratuitously, for example. In those cases, which are likely the vast majority, the issue we face would not arise: there could not be a genuine issue that the employer had no knowledge of a disability.
 

 “However, unlike with race or sex discrimination, there are situations in alleged disability discrimination cases where an employer clearly did not know and could not have known of an employee’s disability. We think that an employer cannot be liable under the ADA for firing an employee when it indisputably had no knowledge of the disability.”
 
 (Hedberg
 
 v.
 
 Indiana Bell Telephone Co., Inc.
 
 (7th Cir. 1995) 47 F.3d 928, 932.)
 

 “Of course, if an employee tells his employer that he has a disability, the employer then knows of the disability, and the ADA’s further requirements bind tiie employer. Furthermore, it may be that some
 
 symptoms are so obviously manifestations of an underlying disability
 
 that it would be reasonable to infer that an employer actually knew of the disability. For example, it would appear to most observers that an employee who suffers frequent seizures at work likely has some disability. If an employer admitted it fired the employee because of his frequent seizures, a reasonable inference might be drawn that the employer knew the employee had a disability. Nor should deliberate ignorance insulate an employer from liability.” (47 F.3d at p. 934.) There was no evidence Bowsmith was aware of the specifics of plaintiff’s learning disability while he was employed there. Therefore, the question is whether plaintiff’s difficulties with reading and writing reports were so obviously a manifestation of his learning disability that it could be inferred Bowsmith knew of it.
 

 The Eleventh Circuit Court of Appeals specifically addressed whether an employer’s knowledge of an employee’s inability to read or write equates to knowledge of a mental or developmental disability in
 
 Morisky
 
 v.
 
 Broward County
 
 (11th Cir. 1996) 80 F.3d 445. Morisky applied for the position of custodian in Broward
 
 County. On
 
 her application she indicated she did not have the required high school diploma, but asked that she be considered for the position because she had completed special education courses. When she arrived to take the test, she was accompanied by another person who informed the test proctor that plaintiff was illiterate and suffered from bronchial asthma. Plaintiff asked that someone read the test to her. Her request was refused because the test proctor believed that the ability to read was a requirement of the position for which plaintiff applied. Plaintiff did not say she suffered from any mental or developmental disability.
 
 (Id.
 
 at pp. 446-447.)
 

 Plaintiff filed a complaint under the ADA, claiming defendant did not provide a reasonable accommodation for her disability when it refused to
 
 *725
 
 allow her to take the test orally. Defendant claimed plaintiff failed to establish a prima facie case under the ADA. The district court agreed and entered a summary judgment in favor of defendant.
 
 (Morisky
 
 v.
 
 Broward County, supra,
 
 80 F.3d at pp. 447-448.) On appeal, the Eleventh Circuit Court of Appeals affirmed, adopting the reasoning of the district court.
 
 (Id.
 
 at p. 446.) “While illiteracy is a serious problem, it does not always follow that someone who is illiterate is necessarily suffering from a physical or mental impairment. [Citation.] Vague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under the ADA.”
 
 (Id.
 
 at p. 448.) The court concluded by stating: “There is no evidence in this case that the defendant knew that the plaintiff’s inability to read was a result of an organic dysfunction rather than a lack of education.” (80 F.3d at pp. 448-449; see
 
 Illingworth
 
 v.
 
 Nestle U.S.A., Inc.
 
 (D.N.J. 1996) 926 F.Supp. 482, 489 [employee’s difficulty in mastering a computer program not such an obvious manifestation of his underlying dyslexia as to place employer on notice of the disability].)
 

 Plaintiff never told Bowsmith he had a learning disability. Although he had difficulty in school, there is no evidence this information was provided to Bowsmith. Plaintiff states he told Smith, Olney, and his previous supervisor, Hawkins, that he had “trouble” completing the written reports required of him and that it took him a long time to do so because of his “problem” with reading and writing. It is further apparent from the evidence presented that plaintiff never claimed he was totally unable to read and write. Rather, he stated his ability to do so was limited and required a good deal of time.
 

 We conclude, as a matter of law, that the information provided by plaintiff is not sufficient to charge Bowsmith with knowledge that plaintiff suffered from a mental disability as defined by the FEHA. Plaintiff’s nonspecific complaints of “trouble” or “problems” with reading or writing and his inability to complete required reports are not such obvious manifestations of an underlying learning disability that it would be reasonable to infer Bow-smith knew plaintiff suffered from a mental disability as defined by the FEHA. Therefore, the motion for summary adjudication was properly granted. Regardless of whether plaintiff established he suffered from a qualifying mental disability or whether he was qualified with or without accommodation to perform his job, he did not produce any evidence Bow-smith knew of his disability.
 

 II.
 
 Termination at will versus for good cause
 

 *
 

 
 *726
 
 Disposition
 

 The judgment granting the motion for summary adjudication on the first cause of action is affirmed. The judgment granting the motion for summary adjudication on the second, third, and fourth causes of action is reversed. Each party shall bear its own costs on appeal.
 

 Ardaiz, P. J., and Levy, J., concurred.
 

 [1]
 

 All statutory references are to the Code of Civil Procedure unless otherwise stated.
 

 *
 

 See footnote,
 
 ante,
 
 page 709.