Filed 12/29/15  Stonebarger v. City of Arcata CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| KEVIN STONEBARGER,<br><br>　　　Plaintiff and Appellant,<br><br>v.<br><br>CITY OF ARCATA et al.,<br><br>　　　Defendants and Respondents. | A143792<br><br>(Humboldt County<br>Super. Ct. No. DR130283) |

Kevin Stonebarger appeals from a summary judgment with respect to his causes of action for failure to provide a reasonable accommodation of his disability and failure to engage in the interactive process.  (Gov. Code, § 12940, subds. (m) & (n).)  He contends the court erred in concluding there was no triable issue of material fact, in light of evidence that respondents knew of his knee injuries and Stonebarger requested an accommodation.  We will affirm the judgment.

## I.  FACTS AND PROCEDURAL HISTORY

Stonebarger was employed by respondent City of Arcata (City) as a police officer beginning in 1999.  Between 2007 and 2012, he suffered several knee injuries and had multiple surgeries.

In January 2012, the City's police chief, respondent Thomas Chapman, assigned Stonebarger to the Drug Task Force (DTF).  At the time, Chapman discussed his reservations with Stonebarger concerning Stonebarger's previous interpersonal conflicts and warned him not to have others.

1

On February 22, 2012, Stonebarger was involved in a conflict in a parking lot with a tow truck driver. After an internal investigation and a "Notice of Intent to Take Disciplinary Action," Chief Chapman removed Stonebarger from the DTF and reassigned him to patrol.

Stonebarger wanted to be assigned to a cover unit rather than to a patrol or beat position. According to respondents, Stonebarger desired the cover unit assignment because he thought he was entitled to it, rather than to accommodate any disability; Lieutenant Bart Silvers assigned Stonebarger to patrol on the graveyard shift because that shift had an opening. According to Stonebarger, he wanted a cover position because it would have been easier on his knees.

On April 1, 2012, after being returned to patrol duty, Stonebarger suffered an injury to his right knee. A nurse practitioner released him to full duty on April 17, 2012.

On August 26, 2012, while on patrol, Stonebarger suffered a career-ending injury to his right knee.

Stonebarger thereafter obtained a right-to-sue letter from the California Department of Fair Employment and Housing as a prerequisite to bringing a lawsuit under the Fair Employment and Housing Act (FEHA).

A. Stonebarger's Complaint

Stonebarger filed a lawsuit against the City and Chief Chapman for disability discrimination, failure to provide reasonable accommodation, failure to engage in the interactive process, failure to prevent or correct discrimination, intentional interference with prospective economic relations, violation of his right of privacy, intentional infliction of emotional distress, and negligent infliction of emotional distress. Among other things, Stonebarger alleged that the City failed to accommodate his disability and failed to engage in the interactive process by assigning him to patrol duty in March 2012.

B. Respondents' Summary Judgment Motion

Chief Chapman and the City filed a motion for summary judgment or, in the alternative, summary adjudication of issues. As relevant here, they contended they were

2

entitled to judgment on (1) Stonebarger's cause of action for failure to provide reasonable accommodation because the City did not know Stonebarger had a disability that limited his ability to work; and (2) his cause of action for failure to engage in the interactive process because of this lack of notice and because Stonebarger never requested an accommodation.[1]

### 1. Respondents' Evidence

In support of their summary judgment motion and separate statement of material facts, respondents submitted evidence, including Stonebarger's deposition testimony, of the following.

Although Stonebarger sustained knee injuries between 2007 and 2012, he was released to full duty without restriction each time. For example, Stonebarger admitted in deposition that he was medically released to full work duties by his orthopedist, despite his knee condition, on November 29, 2011. As of the date he was assigned to the DTF in January 2012, no doctor had told him he was precluded from performing police officer duties. When he was reassigned to patrol duty on the graveyard shift in March 2012—the time of the alleged failure to accommodate a disability—he was still released to full duty and no medical professional had told him he could not work the graveyard shift due to any disability. And after the reassignment in March 2012, other than for approximately two weeks in April 2012, Stonebarger remained released to regular work duties without restriction. During the time he was released to full work duties, he was able to perform his patrol duties and special services duties despite pain and discomfort in his knee.

Furthermore, Stonebarger did not tell the City he had a disability. When he was assigned to the DTF in January 2012, Stonebarger told Chief Chapman that his knee was "bad," he did not know how much longer it would hold up, and working plainclothes without the gear would allow his knee to heal. But Stonebarger admitted in deposition that he did not tell Chief Chapman that the condition of his knee imposed *any limitations*

---

[1] After respondents filed and served their summary judgment motion, Stonebarger dismissed without prejudice all of his other causes of action. In so doing, he dismissed all causes of action alleged against Chief Chapman.

3

*on his ability to serve as a police officer*. And, according to the deposition testimony of Stonebarger's supervisor, Sergeant Ben Whetstine, Stonebarger complained of pain but never requested any accommodation for a disability or stated he was unable to perform the physical requirements of his position due to a disability. Indeed, in response to the City's notice of intent to discipline him for the tow truck incident, neither Stonebarger nor his lawyer claimed that Stonebarger had a disability that the City failed to accommodate.

### 2. Stonebarger's Evidence

In opposition to respondents' motion, Stonebarger argued that the City *did* know of his disability and he asked for an accommodation. To support this position, Stonebarger submitted a declaration setting forth his version of the events.

Between November 2007 and August 2012, Stonebarger suffered more than five injuries to his right knee, necessitating two surgeries and a procedure called a "gross manipulation." He was out of work on disability in 2008, 2010, and 2011, for a combined period of four months.

In November 2007, for example, Stonebarger suffered an injury to his right knee during his employment and had surgery in November 2008. Chief Chapman knew of this injury because Stonebarger was out of work for over two months, and Chief Chapman was in charge of creating and overseeing the schedule and had signed the "Immediate Supervisor Report of Employee Injury."

On October 28, 2008, Stonebarger's internist, Dr. Davis S. Gans, wrote a letter "To Whom It May Concern" stating that Stonebarger's knee problems "interfere with him doing active, physical police work." Dr. Gans advised: "He cannot walk long distances, he cannot run, he cannot stoop and bend repetitively getting in and out of cars, etc." The City was in possession of this letter, since it was produced in discovery.[2]

---

[2] Danette Demello, then personnel director for the City, was custodian of Stonebarger's personnel file and workers' compensation file. She testified that the files contained details about Stonebarger's injuries and surgeries and the City and Chief Chapman had access to the files.

4

Dr. Gans never cleared Stonebarger for active patrol duty on the police force. At his deposition, Dr. Gans testified that his opinion about Stonebarger not doing patrol work did not change from 2008 to 2012, and he believed that he communicated his view to the City by "other letters," telephonically, and through Stonebarger. However, Dr. Gans testified, the City did not seem to think Stonebarger's injuries were as serious as Dr. Gans opined.

Stonebarger's knee problems continued. In September 2010, he was involved in a vehicular accident while on duty, injuring his back and further injuring his knee. Chief Chapman knew of these injuries, since he visited Stonebarger in the hospital. In November 2010, Stonebarger had a second knee surgery, and in May 2011, he underwent the "gross manipulation" procedure, which caused him to miss one week of work. From May 2011 through January 2012, he received no further treatment on his knee because his orthopedist, Dr. Raymond Koch, said there was nothing more he could do and physical therapy could make the situation worse. Stonebarger purportedly relayed this information to Chief Chapman.

In 2011, Stonebarger asked Melissa Chonzena at Redwood Empire Municipal Insurance Fund (REMIF), the City's workers' compensation insurance carrier, if the City and REMIF would agree to have Dr. Gans manage his care. Chonzena agreed.

In December 2011, Dr. Koch released Stonebarger to full duty. At that time, however, he had park ranger duty rather than patrol duty, and therefore sat less and used lighter equipment and lightweight boots.

On January 9, 2012, Stonebarger was assigned to the DTF. Stonebarger thanked Chief Chapman for removing him from park ranger duty and placing him on the DTF. Stonebarger told Chief Chapman that even as a park ranger, his knee was locking up, causing increased pain and limited mobility. Stonebarger told Chief Chapman that by giving him the DTF assignment, he was significantly extending Stonebarger's career.

On February 27, 2012, Stonebarger was removed from the DTF pending an internal investigation into a complaint of rudeness to a tow truck driver. When he met with Chief Chapman and Lieutenant Bart Silvers, Stonebarger objected to his removal,

5

citing his knee injuries among other matters. Stonebarger informed Chief Chapman and Lieutenant Silvers that he could not return to patrol duty because he was "one foot pursuit away from a blown out knee," which would be a career-ending injury. Stonebarger stated that he needed an assignment that was compatible with his long-term knee and back injuries.

On March 2, 2012, Stonebarger was assigned to patrol duty on the graveyard shift, which Stonebarger characterized as the most physically rigorous and challenging position in the department. He complained about his knee problems to his direct supervisor, Sergeant Whetstine, on a regular basis. He told Whetstine that the job was causing him pain, especially when he had to get in and out of the patrol car; he complained that foot patrol was very difficult and was exacerbating his knee injury; and he claimed he was one foot pursuit from a blown-out knee.

On April 1, 2012, Stonebarger suffered another right knee injury while on patrol duty, which kept him out of work for two weeks. Chief Chapman signed the "Immediate Supervisor's Report of Employee Injury." The City directed Stonebarger to see nurse practitioner Cheryl Malo-Clines instead of Dr. Gans or another doctor, and Malo-Clines released Stonebarger to full work duty on April 17, 2012.

In April 2012, Stonebarger purportedly told Chief Chapman about his knee injuries, and stressed his need for a different job assignment. He pointed out that he had been on patrol duty on the graveyard shift for only one month before sustaining another knee injury. The City and Chief Chapman declined to give Stonebarger another assignment, despite an open detective position beginning in May 2012.

On August 26, 2012, Stonebarger suffered a career-ending injury to his right knee while engaged in a foot pursuit of a suspect while on patrol during his graveyard shift.

### 3. Trial Court's Ruling

The trial court granted respondents' motion for summary judgment. Noting that both causes of action required Stonebarger to show that the City knew of his disability and physical limitations, the court found that although the City was aware of

6

Stonebarger's knee problems, it did not know he was in fact disabled. Without such notice, the duty to offer reasonable accommodation and engage in the interactive process did not arise. Judgment was entered for the City and for Chief Chapman.

This appeal followed.

## II. DISCUSSION

In reviewing the grant of summary judgment, we conduct an independent review to determine whether there is a triable issue of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 860.) We construe the moving party's evidence strictly, and the non-moving party's evidence liberally, in determining whether there is a triable issue. (See *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 20 (*D'Amico*); *Alex R. Thomas & Co. v. Mutual Service Casualty Ins. Co*. (2002) 98 Cal.App.4th 66, 72 (*Thomas*).)

A defendant seeking summary judgment must show that at least one element of the plaintiff's cause of action cannot be established, or that there is a complete defense to the cause of action. (Code Civ. Proc. § 437c, subd. (p)(2).) The burden then shifts to the plaintiff to show there is a triable issue of material fact on that issue. (See *id.*; *Thomas*, *supra*, 98 Cal.App.4th at p. 72.)[3]

### A. Reasonable Accommodation of Disability

Government Code section 12940 provides: "It is an unlawful employment practice . . . [¶] [f]or an employer or other entity covered by this part to fail to make reasonable accommodation for the *known physical or mental disability* of an applicant or employee." (Gov. Code, § 12940, subd. (m), italics added.)

---

[3] In this appeal, Stonebarger challenges the judgment only with respect to his causes of action for failure to reasonably accommodate and failure to engage in the interactive process, neither of which were alleged against Chief Chapman. Independent of our other bases for affirming the judgment, the judgment as to Chief Chapman must therefore be affirmed.

The elements of a failure-to-accommodate claim are (1) the plaintiff has a disability within the meaning of the FEHA, (2) the plaintiff is qualified to perform the essential functions of the position, and (3) the employer failed to reasonably accommodate the disability. (*Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1009-1010 (*Scotch*).) Under the FEHA, a "physical disability" includes a physiological disease, disorder, or condition that affects the musculoskeletal system and "limits" a "major life activity." (Gov. Code, § 12926, subd. (m)(1).) "Limits" is synonymous with making the achievement of a major life activity "difficult," and a "major life activity" includes work. (Gov. Code, § 12926, subd. (m)(1)(B)(ii) & (iii); see *Cassista v. Community Foods, Inc.* (1993) 5 Cal.4th 1050, 1061; *Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 345 (*Arteaga*).)

Under the statute, however, an employer is required to accommodate only a "*known* physical . . . disability." (Gov. Code, § 12940, subd. (m), italics added.) Thus, the employee bears the burden of giving the employer notice of the disability, and the employer's duty to reasonably accommodate does not arise until the employer is actually aware of the disability and physical limitations. (*Avila v. Continental Airlines, Inc*. (2008) 165 Cal.App.4th 1237, 1252 (*Avila*).) Moreover, the employee must show evidence that the disability was known to the persons who actually participated in the employment decision. (*Id*. at pp. 1249-1251.)

### 1. City's Evidence

Although the City knew that Stonebarger had a history of injuries to his right knee, it also knew that he had been released to full duty after those injuries. As Stonebarger admitted in his deposition, at the time of the alleged failure to accommodate—his reassignment to patrol on the graveyard shift in March 2012—Stonebarger had been released to full duty without restriction, and no doctor had informed him that he was limited in his ability to do patrol duties or that he could not work the graveyard shift. During this time, Stonebarger admitted, he was "generally *able*" to perform his duties as a patrol officer despite his pain and discomfort. (Italics added; see *Arteaga*, *supra*, 163

8

Cal.App.4th at pp. 345-347 [distinguishing between pain in performing duties and a disability limiting the ability to perform those duties].)

Moreover, Stonebarger did not *inform* the City that he had a disability that limited his ability to work patrol on the graveyard shift. When he was appointed to the DTF in January 2012, for instance, he did not contend he had any disability limiting his capacity to work. On this point, Stonebarger was asked in deposition, "[During the meeting with] the chief [in January 2012], did you tell the chief that there were any limitations on your ability to serve as a police officer because of your right knee condition?" Stonebarger answered no. Further, Stonebarger testified, he did not ask Chief Chapman that he be assigned to the DTF specifically due to problems he was having with his right knee, and he did not tell anyone at the police department that he wanted to go to the DTF because he could not physically perform the duties of a police officer.

Around the time he was removed from the DTF and reassigned to patrol duty on the graveyard shift in March 2012, Stonebarger did not provide any medical documentation that he could not work on patrol. Stonebarger's deposition transcript on this point reads: "Q: So between the time of when you got assigned to the graveyard [shift] and before your [April 1, 2012] injury, did you make any effort to get some medical note from a medical provider saying you couldn't work on graveyard? [¶] A: No, I did not." And while Stonebarger hired a lawyer to oppose his removal from the DTF, neither the lawyer nor Stonebarger claimed at that time that Stonebarger could not work patrol because of any disability-related limitations.

Nor did Stonebarger notify the City that he had a disability *while* he was assigned to patrol on the graveyard shift. According to the deposition testimony of Stonebarger's supervisor, Sergeant Whetstine, Stonebarger never requested any accommodation for a disability or stated he was unable to perform the physical requirements of his position due to a disability.

Based on this evidence, a reasonable trier of fact could conclude that the City did not have notice that Stonebarger suffered from a disability that limited his ability to

9

perform patrol duties on the graveyard shift. The burden then shifted to Stonebarger to demonstrate, with admissible evidence, a triable issue of material fact.

### 2. Stonebarger Did Not Show a Triable Issue of Material Fact

Stonebarger contends the City knew or should have known that he had a disability based on what he told Chief Chapman, what he told Sergeant Whetstine, and what was contained in his workers' compensation and personnel files, including Dr. Gans's October 2008 letter. This evidence, and Stonebarger's additional arguments, fail to demonstrate a material factual issue.

#### a. Statements to Chief Chapman

Stonebarger asserted in his declaration that he told Chief Chapman during their January 2012 meeting "that while on Ranger duty, my right knee kept locking up and popping and this was causing me increased pain and limiting my mobility" and that "by giving me the assignment he was significantly extending my career."

This evidence does not raise a triable issue of material fact, however. An employee's complaints of pain and subjective perceptions of a disability are insufficient, in themselves, to provide notice of a disability for purposes of the FEHA. (See *Arteaga*, *supra*, 163 Cal.App.4th at pp. 345-347.) Stonebarger acknowledges in his reply brief that his declaration did not indicate he advised Chief Chapman of any actual *limitations* on his *ability* to serve as a police officer. And even if Stonebarger's declaration had alleged telling the chief about such limitations, the averment would have to be disregarded in light of Stonebarger's contrary deposition testimony that he did *not* "tell the chief that there were any limitations on [his] ability to serve as a police officer because of [his] right knee condition." (*D'Amico*, *supra*, 11 Cal.3d at pp. 21-22; *Leasman v. Beech Aircraft Corp.* (1975) 48 Cal.App.3d 376, 382 [plaintiff's averments in declaration opposing summary judgment may be disregarded if they are contrary to admissions in discovery].)

Stonebarger also stated in his declaration that he objected to his removal from the DTF in a meeting with Chief Chapman and Lieutenant Silvers, citing, among other

10

things, his knee injuries. Specifically, Stonebarger purportedly informed Chief Chapman and Lieutenant Silvers that he could not return to patrol duty because he was one foot pursuit away from a blown-out knee, and he needed an assignment that was compatible with his long-term knee and back injuries. Again, however, "[a]n employer does not have to accept an employee's subjective belief that he is disabled and may rely on medical information in that respect." (*Arteaga*, *supra*, 163 Cal.App.4th at p. 347 [no triable issue established by employee's general report of pain and numbness, where physician found nothing wrong and sent him back to work without restrictions].) Here, Stonebarger had been released to duty by his orthopedist without restriction, and Stonebarger did not tell Chief Chapman of any medical opinion to the contrary.

### b. Statements to Sergeant Whetstine

Stonebarger averred in his declaration that he regularly complained to Sergeant Whetstine that he was having pain when he got in and out of the patrol car, foot patrol was very difficult, and he was one foot pursuit from a blown-out knee. This too fails to establish a triable issue of material fact.

In the first place, Stonebarger provided no evidence that any statements he made to Sergeant Whetstine were communicated to Chief Chapman before Stonebarger was removed from the DTF and placed on patrol duty, or even evidence that this type of information would have been communicated to the chief in the usual course. Information unknown to the decision maker is immaterial. (*Avila*, *supra*, 165 Cal.App.4th at p. 1250 [no basis to impute to decision maker actual knowledge of employee's statements to coworkers about a disability, without evidence they told the decision maker or had a duty to do so]; see *Morgan v. Regents of University of California* (2001) 88 Cal.App.4th 52, 73-74 [no demonstration of retaliatory motive where decision makers claimed they were unaware of a grievance, even though other workers knew of it].)

Moreover, Stonebarger's comments to Sergeant Whetstine amounted to a complaint of pain and a subjective belief that his knee was "close to blowing out," which does not raise a triable issue concerning notice of a limiting disability. (*Arteaga*, *supra*,

11

163 Cal.App.4th at pp. 345-347.)  In light of the fact he was medically cleared for duty, his subjective belief that patrol was very difficult did not constitute notice to the City of an actual disability requiring accommodation under the FEHA.

### c. Dr. Gans's Letter and Other Documents in Stonebarger's Files

Stonebarger argues that his personnel file and workers' compensation file contained information about his knee injuries, including indications that he had received disability income and had open workers' compensation claims for his knee injuries. Moreover, the workers' compensation file contained Dr. Gans's October 2008 letter, which opined that Stonebarger's knee problems "interfere with him doing active, physical police work" and he could not walk long distances, run, stoop, or "bend repetitively getting in and out of cars, etc."[4]

Taken as a whole, however, the workers' compensation records confirm that the City did *not* have notice that Stonebarger was suffering from a disability and had particular limitations *as of March 2, 2012*, when Stonebarger was reassigned to patrol. Dr. Gans's letter, written way back in October 2008, did not advise that Stonebarger's limitations were permanent.  And the workers' compensation records for periods *after* 2008 included a number of releases for Stonebarger to return to full duty without restrictions in years 2009 and 2010.  The records also indicated that Stonebarger was performing his regular police duties after 2008 without medical difficulty:  in June 2009, Stonebarger was "able to do his normal work," was "having no significant knee problems," and was "permanent and stationary [eight] months post arthroscopy" and "continuing his regular [*sic*] without restriction."  Indeed, the file included Dr. Gans's

---

[4]    Respondents urge that Stonebarger provided no evidence that Chief Chapman knew about Dr. Gans's 2008 letter when he placed Stonebarger on patrol duty in March 2012.  Stonebarger responds that Chief Chapman had access to the files and *should* have informed himself of their content in light of Stonebarger's complaints about pain in his knee.  We need not decide whether a decision maker's constructive rather than actual notice of information in a personnel file would suffice in this context; here, the information in Stonebarger's files did not provide notice of a disability, whether Chief Chapman had actual knowledge of it or not.

12

notations in March 2012 reflecting his knowledge that Stonebarger was still working as a police officer, without any further admonition from Dr. Gans that he should not be. The workers' compensation and personnel files do not create a triable issue as to whether the City knew Stonebarger had a disability that limited his ability to do patrol duty in March 2012.[5]

#### d. *Stonebarger's Other Arguments*

Stonebarger's additional arguments also fail to persuade us that he established a triable issue. First, he emphasizes that he was never released to full duty by *Dr. Gans* in particular. He was, however, released to full duty by *other* medical professionals. And while Dr. Gans was Stonebarger's chosen doctor for workers' compensation purposes, the City was entitled to consider all of the medical evidence it had received. Indeed, Dr. Gans was an *internist*—not an orthopedist—and had a preexisting relationship with Stonebarger and previously employed Stonebarger's mother. When Stonebarger needed treatment for his knees, Dr. Gans referred him to Dr. Koch, an orthopedist, rather than treating Stonebarger himself. Dr. Koch subsequently released Stonebarger to full duty without restriction.

Stonebarger next challenges the releases provided by the other medical professionals, contending that the release by Dr. Koch occurred when Stonebarger was a park ranger (requiring lighter equipment and activity) and the release provided in April 2012 was by a nurse practitioner the City had selected. However, Dr. Koch also advised that Stonebarger was "able to do his normal work" at the "present time" in June 2009, when Stonebarger was on *patrol* duty and had not yet been assigned to parks. Moreover, regardless of which medical professional provided the releases, the point is that no

---

[5]    Dr. Gans also testified that he had communicated his views by "other letters," telephonically, and through Stonebarger. But this evidence, devoid of any details as to the time, content, or recipient of these communications, does not raise a triable issue of material fact. (*Avila*, *supra*, 165 Cal.App.4th at p. 1253 [evidence that plaintiff "called in sick" was insufficient to put employer on notice that he required accommodation, without evidence regarding to whom he spoke or what he said].)

13

medical professional had told the City that Stonebarger had a disability limiting his ability to work around the time he was reassigned to patrol.

Stonebarger further contends that respondents *should* have known about his disability, and the fact that they did not know merely shows their "deliberate ignorance," as evinced by Dr. Gans's impression that the people with whom he spoke at the police department did not believe Stonebarger's injury was as serious as Dr. Gans opined. For this proposition, Stonebarger relies on *Pensinger v. Bowsmith, Inc.* (1998) 60 Cal.App.4th 709, 723-724, but that decision does nothing to help his case. There, the court ruled that, as a matter of law, an employee's complaints to his employer that he had difficulty reading and writing were *not* sufficient to charge the employer with knowledge that he had a mental disability. (*Id*. at pp. 724-725.) In any event, evidence of Dr. Gans's impression of the receptiveness of unnamed personnel does not create a triable issue as to whether the City knew Stonebarger had a disability.

Lastly, Stonebarger argues that an employer may have knowledge of an employee's disability even though the employee has been released by a physician without work restrictions. (Citing *Raytheon Co. v. Fair Employment & Housing Com.* (1989) 212 Cal.App.3d 1242, 1245-1249 (*Raytheon*).) That might be so, depending on the evidence, but it is not *always* the case. (*Arteaga*, *supra*, 163 Cal.App.4th at p. 351.) The question is whether there is *evidence* the employer knew of a disability despite the release. In *Raytheon*, there was evidence the employer had actual knowledge that its employee had AIDS, which is a degenerative condition that becomes progressively worse over time. (*Raytheon*, at pp. 1248-1250.) But here, there was no evidence the City knew Stonebarger's condition was degenerative or becoming worse: to the contrary, despite Dr. Gans's concerns in 2008, Stonebarger's medical records indicated he was performing his job duties in 2009 *without* significant knee problems.[6]

---

[6]     *Raytheon* is inapposite anyway. There, the court decided whether AIDS was a physical handicap under the FEHA and whether the employer violated the FEHA by refusing to reinstate him on the ground he posed a health threat to other workers. (*Raytheon*, *supra*, 212 Cal.App.3d at pp. 1248, 1252.) It did not decide whether an

In sum, while Chief Chapman and the City knew Stonebarger had knee injuries and complained of pain and other subjective matters, there was no evidence they knew of a limitation on his ability to perform patrol duties so as to constitute notice of a disability for purposes of the FEHA, particularly in light of medical records indicating he was released to full duty without restriction. (See *Scotch*, *supra*, 173 Cal.App.4th at p. 1008 [knowledge of a limiting disability will be imputed only when it is the *only* reasonable interpretation of the known facts].) Stonebarger failed to establish a triable issue of material fact, and the trial court did not err in granting judgment as to his cause of action for failure to reasonably accommodate a disability.

## B. Failure to Engage in the Interactive Process

Under Government Code section 12940, it may be an unlawful employment practice for "an employer . . . to fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a *known* physical or mental disability or known medical condition." (Gov. Code, § 12940, subd. (n), italics added.)

In order to prevail on a cause of action for failure to engage in the interactive process, Stonebarger would have to establish, among other things, that he had a disability under the FEHA that was *known* to the City. For the reasons discussed *ante*, Stonebarger failed to demonstrate a triable issue of fact concerning the City's knowledge of such a disability. Accordingly, the trial court did not err in granting summary judgment with respect to this claim.

## III.  DISPOSITION

The judgment is affirmed.

---

employer had notice of a *disability* when its employee had AIDS, let alone whether an employer had notice of a disability when its employee merely had complaints of pain and mobility issues.

15

_____

NEEDHAM, J.

We concur.

_____

JONES, P.J.

_____

BRUINIERS, J.

(A143792)