Opinion
 

 STRANKMAN, P. J.
 

 Plaintiffs sued their next-door neighbor and the paint contractor who sanded and repainted the neighbor’s old Victorian house in San Francisco, alleging that the topsoil in their backyard had been contaminated by lead-bearing paint dust and paint chips. Plaintiffs sought damages based on theories of trespass, nuisance, and negligence. A jury awarded plaintiffs economic damages of $120,850 and noneconomic damages of $25,000.
 

 Plaintiffs sought attorney fees pursuant to Code of Civil Procedure section 1021.9, which authorizes an award of fees in an action for damages to real property “resulting from trespassing on lands either under cultivation or intended or used for the raising of livestock . . . .” We conclude in the published portion of this opinion that the trial court correctly denied fees,
 
 *1369
 
 because plaintiffs’ urban backyard is not “lands . . . under cultivation” within the meaning of that statute.
 
 [1]
 

 I.-III.
 
 *
 

 IV. Cross-appeal by the Quartermans
 

 A.
 
 Attorney Fees
 

 After the jury rendered its verdict in their favor, plaintiffs John W. Quarterman and his wife Fabienne Blanc (the Quartermans) sought attorney fees of over $420,000, based on Code of Civil Procedure section 1021.9, which provides: “In any action to recover damages to personal or real property resulting from trespassing on lands either under cultivation or intended or used for the raising of livestock, the prevailing [party] shall be entitled to reasonable attorney’s fees in addition to other costs, and in addition to any liability for damages imposed by law.”
 
 [4]
 
 They argued that the verdict established that defendants, including Lindsay Kefauver, were liable for damages caused by trespassing. Based on the evidence about their backyard gardening, they also argued that their property was “under cultivation” within the meaning of the statute at the time of the trespass.
 

 That evidence indicated that when the Quartermans bought their home, the backyard was terraced with large planter boxes and filled with overgrown plants. In May 1992, Ms. Blanc and her father removed many of the plants, dismantled the boxes, and tilled the soil extensively to make a more level planting surface. They preserved some plants, including an apricot tree and some tomato plants, and purchased and planted many others, and had plans to add a small lawn and more flowering bushes and shrubs. After the lead contamination of their property, the Quartermans curtailed most of their gardening activities and the yard again became overgrown.
 

 The trial court denied the motion for fees, reasoning that the statutory term “cultivation” refers to “something beyond . . . normal homeowner planting.”
 

 Relying primarily on
 
 Haworth
 
 v.
 
 Lira
 
 (1991) 232 Cal.App.3d 1362 [284 Cal.Rptr. 62]
 
 (Haworth),
 
 the Quartermans contend the denial of fees
 
 *1370
 
 was erroneous. At issue in
 
 Haworth
 
 was that portion of the statute referring to the raising of livestock. The plaintiffs lived in an area zoned an “ ‘equestrian district,’ ” which allowed keeping horses and other large domestic animals as an accessory to residential use. They had two corrals, an exercise arena, and several horses, including a three-year-old which was bom and raised on their property, and they also raised goats, geese, ducks, chickens, and dogs. After two pit bulldogs intmded onto plaintiffs’ property and severely injured one of their horses, plaintiffs sued the dogs’ owner.
 
 (Id.
 
 at pp. 1365-1367.)
 

 The jury rendered a verdict in plaintiffs’ favor, and they sought attorney fees based on section 1021.9. The trial court denied fees, reasoning that the statute applied only to commercial ranchers or farmers. Over a dissent, the
 
 Haworth
 
 court reversed the fee order. First, the majority held that the statutory language was clear and unambiguous, making it unnecessary to consider any legislative history or engage in statutory construction. The statute plainly authorized fees in the case of damage from trespass to land “‘used for the raising of livestock,’” and the evidence that plaintiffs’ property was used for that purpose was uncontradicted.
 
 (Haworth, supra,
 
 232 Cal.App.3d at pp. 1367-1368.)
 

 Next, the majority stated that even if it considered the available and admissible legislative history material, it would come to the same conclusion. Some of the proffered material, such as a letter from a former legislative staff member, was inadmissible and of no weight on the question of legislative intent. Other available material, such as legislative committee reports, the Legislative Counsel’s Digest, and the changes in the legislation from its introduction to its enactment, did not indicate an intent to benefit only persons in the ranching and agricultural industry.
 
 (Haworth, supra,
 
 232 Cal.App.3d at pp. 1370-1371.)
 
 [5]
 

 The dissent disagreed, emphasizing that the applicable zoning permitted plaintiffs to keep horses and other animals only for personal use. The dissent’s view was that the statutory phrase, “lands either under cultivation or intended or used for the raising of livestock,” ordinarily and usually means “lands in the agricultural industry.” According to the dissent, the majority improperly read the statute literally while ignoring the usual and ordinary import of its words and the intent of the Legislature.
 
 (Haworth, supra,
 
 232 Cal.App.3d at pp. 1373-1374 (cone, and dis. opn. of Ashby, J.).)
 

 
 *1371
 
 The Quartermans argue that the
 
 Haworth
 
 majority’s logic applies equally to the plain language in section 1021.9 referring to lands “under cultivation.” But the matter before that court was whether or not the statute applied to the noncommercial raising of livestock, and its comments about the statutory language and the legislative history must be considered in that narrow context. The question we must decide is whether the Legislature intended the term “lands . . . under cultivation or intended or used for the raising of livestock” to include a small urban backyard which contains a garden. The
 
 Haworth
 
 court was not confronting that issue, and it is elementary that cases are not authority for propositions not considered.
 
 (Canales
 
 v.
 
 City of Alviso
 
 (1970) 3 Cal.3d 118, 127-128, fn. 2 [89 Cal.Rptr. 601, 474 P.2d 417].)
 

 The touchstone of statutory interpretation is the probable intent of the Legislature. When interpreting a statute, we must ascertain legislative intent so as to effectuate the purpose of a particular law. Of course our first step in determining that intent is to scrutinize the actual words of the statute, giving them a plain and commonsense meaning.
 
 (California Teachers Assn.
 
 v.
 
 Governing Bd. of Rialto Unified School Dist.
 
 (1997) 14 Cal.4th 627, 632-633 [59 Cal.Rptr.2d 671, 927 P.2d 1175].) When the words are clear and unambiguous, there is no need for statutory construction or resort to other indicia of legislative intent, such as legislative history.
 
 (California Fed. Savings & Loan Assn.
 
 v.
 
 City of Los Angeles
 
 (1995) 11 Cal.4th 342, 349 [45 Cal.Rptr.2d 279, 902 P.2d 297].) But language that appears unambiguous on its face may be shown to have a latent ambiguity; if so, a court may turn to customary rules of statutory construction or legislative history for guidance.
 
 (Stanton
 
 v.
 
 Panish
 
 (1980) 28 Cal.3d 107, 115 [167 Cal.Rptr. 584, 615 P.2d 1372].)
 

 Furthermore, we must assume that the Legislature has in mind existing laws when it enacts a statute.
 
 {Bailey
 
 v.
 
 Superior Court
 
 (1977) 19 Cal.3d 970, 977-978, fn. 10 [140 Cal.Rptr. 669, 568 P.2d 394].) We must also interpret a statute in context, examining other legislation on the same or similar subjects, to ascertain the Legislature’s probable intent.
 
 (California Teachers Assn.
 
 v.
 
 Governing Bd. of Rialto Unified School Dist., supra,
 
 14 Cal.4th at p. 642.) Therefore we may attempt to gain insight into the intended meaning of a phrase or expression by examining use of the same or similar language in other statutes.
 
 (Frediani
 
 v.
 
 Ota
 
 (1963) 215 Cal.App.2d 127, 133 [29 Cal.Rptr. 912].) Statutory language which seems clear when considered in isolation may in fact be ambiguous or uncertain when considered in context. (See
 
 Stockton Sav. & Loan Bank
 
 v.
 
 Massanet
 
 (1941) 18 Cal.2d 200, 207 [114 P.2d 592].)
 

 Numerous other statutes refer to lands under cultivation, cultivated lands, or similar terms. For instance, in setting forth the state’s agricultural policy
 
 *1372
 
 in the Food and Agricultural Code, the Legislature made several findings and declarations, including the following: “Although California’s cultivated land accounts for approximately 3 percent of the country’s entire supply of farmland, the state has historically produced about 10 percent of the farm cash receipts in the United States.” (Food & Agr. Code, § 802, subd. (b).) The Separation of Grade District Act in the Streets and Highways Code excludes uninhabited farm acreage from such districts, defining farm acreage for that purpose as “any land which is under cultivation or which is being used for pasture or grazing at the time of the hearing.” (Sts. & Hy. Code, §§ 8100, 8121.5.) Revenue and Taxation Code section 23701a, subdivision (a), defines the term “agricultural” as including “the art or science of cultivating land, harvesting crops or aquatic resources, or raising livestock.” Labor Code section 1695.7, concerning the license required for a farm labor contractor, defines an agricultural grower as including any person who owns or leases “land used for . . . cultivation ... of any farm products . . . .” (Lab. Code, § 1695.7, subd. (d)(2).)
 

 Furthermore, the Public Resources Code authorizes the sale of certain state lands, limiting the sale of land “suitable for cultivation” to certain buyers. (Pub. Resources Code, §§ 7604, 7605.) An almost identical phrase in a former provision of the California Constitution has been construed as including all lands ready for occupation, and which by ordinary farming processes are fit for agriculture.
 
 (Manley
 
 v.
 
 Cunningham
 
 (1887) 72 Cal. 236, 241 [13 P. 622] [construing former art. XVII, § 3, Cal. Const, of 1879, repealed in 1972].)
 

 The phrase “lands under cultivation,” paired with the alternative description “or enclosed by fence,” appears in several statutes prohibiting entry onto certain land without the owner’s permission. Misdemeanor trespass as defined by Penal Code section 602 includes “[e]ntering any lands under cultivation or enclosed by fence ... or entering upon uncultivated or unenclosed [posted] lands” without the written permission of the owner, and either refusing to leave upon request, tearing down a sign forbidding trespass, removing any lock on a gate leading onto the lands, or discharging a firearm. (Pen. Code, § 602, subd. (k); see also Pen. Code, § 602.8, subd. (a); Fish & G. Code, § 2016 [unlawful to enter “lands under cultivation or enclosed by a fence” to discharge a firearm or take or destroy any mammal or bird without written permission]; Fish and G. Code, § 2017 [unlawful to take any mammal or bird or discharge a firearm on any posted land, “whether fenced, cultivated, or not”].)
 

 Other references to cultivated land or ground appear in Government Code section 25660 (portion of a river may be declared a public highway for the
 
 *1373
 
 purpose of fishing if it does not run through “cultivated land” lying within the county, among other conditions); Code of Civil Procedure section 733 (imposing civil liability for cutting or injuring a tree on the land of another, or on a street or highway in front of a house, or on “cultivated grounds,” among other locations); Public Resources Code section 29101 (Suisun Marsh includes wetlands, seasonal marshes, lowland and upland grasslands, and “cultivated lands” specified on a certain map); and Revenue and Taxation Code section 402 (“Cultivated and uncultivated land of same quality and similarly situated shall be assessed at the same value.”).
 

 This sampling of statutes suggests that when the Legislature refers to land as cultivated, under cultivation, used for cultivation, or suitable for cultivation, the ordinary import of the description usually is to agricultural land used for farming and growing crops, or at least rural land as opposed to urban backyards. We recognize that these samples do not establish that the Legislature always uses such words in that limited sense. (See, e.g., Gov. Code, § 66477, subd. (i) [defining recreational community gardening as including cultivation of plant material not for sale]; Food & Agr. Code, § 53303 [defining decorative plants as indoor plants not suitable for cultivation out of doors]; Pub. Resources Code, § 4799.09, subd. (a) [defining urban forestry as cultivation and management of trees in urban areas]; Health & Saf. Code, §§ 11358, 11363 [prohibiting cultivation of marijuana and peyote].) The Quartermans themselves state that the Legislature has used a common, everyday word in a number of different contexts for a variety of different purposes, thereby defeating their assertion that the term is unambiguous. If the meaning of “cultivated” and its related forms varies from statute to statute, it is appropriate to turn to legislative history in our effort to understand the Legislature’s intent concerning the meaning and scope of section 1021.9.
 

 The evolution of legislation from its introduction to its final form may provide some insight into the underlying legislative intent.
 
 (People
 
 v.
 
 Hernandez
 
 (1988) 46 Cal.3d 194, 202-206 [249 Cal.Rptr. 850, 757 P.2d 1013];
 
 In re Jerry R.
 
 (1994) 29 Cal.App.4th 1432, 1440 [35 Cal.Rptr.2d 155].) Statements by the sponsor of legislation may be instructive (see
 
 California Court Reporters Assn.
 
 v.
 
 Judicial Council of California
 
 (1995) 39 Cal.App.4th 15, 30-31 [46 Cal.Rptr.2d 44]), as are legislative committee reports on the proposed legislation
 
 (California Teachers Assn.
 
 v.
 
 Governing Bd. of Rialto Unified School Dist., supra,
 
 14 Cal.4th at pp. 646-647).
 

 Section 1021.9 was enacted in 1986. (Stats. 1986, ch. 1381, § 1, p. 4927.) The bill that eventually resulted in its enactment, Senate Bill No. 2513, changed markedly after its original introduction. As first introduced on
 
 *1374
 
 February 21, 1986, Senate Bill No. 2513 would have added a section to the Vehicle Code making it a misdemeanor for the driver of an off-highway motor vehicle to enter private property while possessing a bolt cutter, heavy duty pliers, or other instrument, with the intent to remove, unlock, or tamper with a fence or gate. It would also have added a section to the Vehicle Code imposing civil liability on such a person. Significantly, the bill was sponsored by the California Cattlemen’s Association, who urged its passage because of losses suffered by ranchers and rural landowners from forcible entry through fences or gates onto their property.
 

 Senate Bill No. 2513 was amended in April 1986, eliminating those two sections and adding instead a Penal Code section, making it a crime to remove, damage, or unlock any fence or gate surrounding a field intended for the raising of livestock, without consent of the owner. As amended, the bill also would have added another section to the Vehicle Code, imposing civil liability, including attorney fees, on the driver of any motor vehicle who entered onto private property without the owner’s consent and removed, damaged, unlocked, or tampered with any fence or gate on or leading onto lands intended for the raising of livestock. The bill was amended again in May 1986, deleting the Penal Code section, but retaining the Vehicle Code section imposing civil liability. The metamorphosis of the bill was completed in August 1986, when it was amended to delete the Vehicle Code section and add the attorney fee provision of section 1021.9. The new section continued to apply to lands “intended or used for the raising of livestock” and added for the first time the alternative reference to lands “under cultivation.” A legislative committee report comments that the amended bill required the award of attorney fees to a prevailing plaintiff in an action for damage to property “resulting from trespass to specified agricultural land.” It also commented that the California Cattlemen’s Association was the source of the bill, reiterating that organization’s concern with losses suffered by ranchers and rural landowners. (Assem. Com. on Judiciary, Rep. on Sen. Bill. No. 2513 (1985-1986 Reg. Sess.) as amended Aug. 12, 1986.)
 

 Of prime consideration in statutory interpretation are the Legislature’s objectives and the evils it sought to prevent.
 
 (Western Oil & Gas Assn.
 
 v.
 
 Monterey Bay Unified Air Pollution Control Dist.
 
 (1989) 49 Cal.3d 408, 426 [261 Cal.Rptr. 384,
 
 111
 
 P.2d 157].) Language in a statute should not be read literally if that reading would result in consequences not intended by the Legislature.
 
 (People
 
 v.
 
 Broussard
 
 (1993) 5 Cal.4th 1067, 1071 [22 Cal.Rptr. 278, 856 P.2d 1134].) When a statute is susceptible to two constructions, one reasonable, fair, and harmonious with its manifest purpose, and another leading to absurd consequences, a court must adopt the former.
 
 (Western Oil & Gas Assn., supra,
 
 at p. 425.)
 

 
 *1375
 
 Taken in isolation and read literally, the term “lands under cultivation” may be broad enough to encompass a backyard garden in a metropolitan area. But that term does not stand alone in section 1021.9; instead, it must be read as part of the entire descriptive phrase, “lands either under cultivation or intended or used for the raising of livestock,” a phrase denoting two alternative uses of rural land. Moreover, reading the term “lands . . . under cultivation” literally and in isolation is unreasonable and absurd when it is clear from the statute’s legislative history that the Legislature was concerned with the unique problems caused by trespassers on rural land owned by farmers and ranchers. Nothing in that history suggests that the Legislature intended also to provide attorney fees to city dwellers who happen to have gardens in their backyards.
 
 [6]
 

 We do not attempt to decide the applicability of section 1021.9 in circumstances other than those in the present case. We hold only that in our view, the phrase “lands either under cultivation or intended or used for the raising of livestock” does not encompass the urban backyard garden owned by the Quartermans in this case. The trial court did not err in denying their motion for attorney fees.
 

 B.
 
 Travel
 
 Expenses
 
 *
 

 V. Disposition
 

 The judgment and the order on costs and attorney fees are affirmed.
 

 Stein, J., and Dossee, J., concurred.
 

 [1]
 

 In that portion of this opinion not certified for publication, we consider defendant neighbor’s appeal from the judgment entered upon the jury verdict; we affirm that judgment.
 

 *
 

 See footnote,
 
 ante,
 
 page 1366.
 

 [4]
 

 A11 statutory references in this section are to the Code of Civil Procedure unless otherwise indicated.
 

 [5]
 

 Section 1021.9 was also at issue in
 
 Elton
 
 v.
 
 Anheuser-Busch Beverage Group, Inc.
 
 (1996) 50 Cal.App.4th 1301 [58 Cal.Rptr.2d 303], in which the court held in the published portion of its opinion that a negligent invasion by fire that causes damage to real property constitutes a trespass within the meaning of that statute.
 
 (Id.
 
 at pp. 1304-1307.) Whether the plaintiffs’ property was intended or used for the raising of livestock was addressed in that portion of the opinion not certified for publication.
 
 (Id.
 
 at p. 1308.)
 

 [6]
 

 We disagree with the majority’s legislative history analysis in
 
 Haworth, supra,
 
 232 Cal.App.3d 1362, to the extent it differs with our conclusion.
 

 *
 

 See footnote,
 
 ante,
 
 page 1366.