[No. D024497. Fourth Dist., Div. One. Feb. 9, 1998.]

ANNE MULLER, Plaintiff and Appellant, v.
AUTOMOBILE CLUB OF SOUTHERN CALIFORNIA, Defendant and
Respondent.

434

---

**COUNSEL**

Jon Y. Vanderpool for Plaintiff and Appellant.

Gray, Cary, Ware & Freidenrich and Cindy M. Cipriani for Defendant and Respondent.

O'Melveny & Myers, Stephen P. Pepe and Steven M. Cooper as Amici Curiae on behalf of Defendant and Respondent.

---

**OPINION**

**HADEN, J.***—In this wrongful termination action plaintiff Anne Muller sued her former employer, Automobile Club of Southern California (Auto Club), for harassment based on a mental disability and medical condition in violation of the Fair Employment and Housing Act (FEHA) (Gov. Code,[1] § 12900 et seq.), breach of contract, breach of the implied covenant of good faith and fair dealing, and wrongful termination in violation of public policy. The court granted Auto Club's motion for summary judgment on the ground California's workers' compensation scheme provides the sole remedy for all of Muller's claims because they arose out of a work-related injury. We affirm on various other grounds.

### FACTUAL AND PROCEDURAL BACKGROUND

Muller was employed by Auto Club from October 1977 through February 1994. On April 26, 1993, while working as a claims adjuster at Auto Club's Escondido district office, Muller informed an Auto Club insured that he would have to make two deductible payments on a claim for damage to his vehicle caused by more than one accident. The insured's son, Mr. Williams, Jr. (Williams), became incensed by Muller's interpretation of his father's

---

*Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1]All further statutory references are to the Government Code unless otherwise specified.

policy and made a series of angry and threatening calls to Muller in which he repeatedly berated and shouted obscenities at her. At some point during this series of calls, coworkers informed Muller that Williams was on his car telephone in the parking lot waiting for her to leave work. Consequently, a police officer escorted Muller to her car at the end of the workday. Fearing for her safety, Muller contacted the Auto Club employee assistance hotline that evening and requested the first available time for a counseling session.

After Williams threatened Muller, certain Auto Club employees made what Muller felt were insensitive, teasing remarks about the incident. Her supervisor Jack Lape asked her, "Anne, did you wear your target today?"

On May 3, 1993, Muller left work early in tears over a disagreement with her assistant supervisor, Evelyn Blake. On May 5, Lape, Blake, and Auto Club regional manager Frank Mieczkowski met with Muller and informed her that her altercation with Blake constituted insubordination. Muller told them she was experiencing fear and anxiety for her safety in the wake of the threats by Williams and requested that certain measures be taken to accommodate her fear.

On the afternoon of May 5, Muller saw Williams sitting at the employee's lunch table adjacent to Auto Club's parking lot. When Muller confronted Lape and Mieczkowski about Williams's presence on company property, they laughed and Lape told her he had informed Williams where she lived and what kind of car she drove.

On May 12, an Auto Club supervisor of travel services said to Muller, "I'm glad to see you're still alive."

On May 10 and 11, Muller saw Dr. Rosben Gutierrez for psychological counseling. Dr. Gutierrez diagnosed Muller as suffering from posttraumatic stress disorder[2] and prescribed various medications, including Klonopin and Paxil. Muller continued counseling sessions with Dr. Gutierrez and Dr. Martin Cary through May and June. The prescription medications she took during that period impaired her ability to perform her job duties. After several successive absences from work, Muller was told Auto Club's personnel policy required her to take a leave of absence. Muller began her leave of absence on June 15 and never returned to work.

In July Muller was referred to Dr. J. Brand Brickman for a psychiatric evaluation. Dr. Brickman diagnosed Muller as suffering from "Adjustment

---

[2]Dr. Gutierrez's diagnosis of posttraumatic stress disorder is shown through Muller's declaration in opposition to summary judgment and Auto Club's answer to Muller's complaint in the federal action. There is no direct evidence in the record that Dr. Gutierrez made such a diagnosis.

Disorder with Anxiety" and concluded she had a "Temporary Total Psychiatric Disability." From July through September, Dr. Brickman and two of his colleagues, Dr. Robert Zink and social worker Lucinda Nerhood, counseled Muller. Dr. Brickman took Muller off all the medications previously prescribed except the antidepressant Paxil. Muller's anxiety decreased and she became progressively more functional under the care of Dr. Brickman and his colleagues.

Through Nerhood, Muller communicated to Auto Club specific safety and security measures she wanted Auto Club to implement to accommodate her fear for her safety in the workplace. Nerhood also communicated Muller's request that Auto Club remove from her personnel file the May 5 counseling interview in which she was accused of insubordination.

On August 23, Muller telephoned district office manager Carolyn Tsuida and Auto Club personnel representative Kimberly Klink to determine what progress Auto Club had made in addressing her safety concerns. Tsuida did not call Muller back. According to Muller's declaration, Klink told her efforts were underway to update Auto Club's safety policies and procedures. Muller testified that she believed Auto Club would be providing her with an updated written safety program. However, Klink testified that she understood Muller sought only a copy of the existing safety manual and written confirmation that the insubordination matter had been removed from her file, and wanted Auto Club to conduct safety meetings with its employees.

Auto Club complied with most of Muller's requests. Klink informed Muller that Rod Middleswart was being reassigned to the Escondido district office as claims supervisor to further accommodate her safety concerns. Middleswart was chosen because of his prior involvement in a shooting incident in Auto Club's East San Diego office in which a female employee was killed. Middleswart sent Muller a letter notifying her that the May 5 counseling interview had been removed from her file. In October Muller received a copy of Auto Club's written safety policies and procedures. Muller noted that the policies and procedures had been updated on May 18, 1993, but the specific security procedures regarding threatening telephone calls had not been changed since February 1992.

Muller felt that Auto Club was not adequately addressing her safety concerns. In an agreed upon reevaluation of Muller's psychiatric condition dated September 15, 1993, Dr. Brickman noted a breakdown in negotiations between Muller and Auto Club. Dr. Brickman concluded that as a result of Muller's experiences with Auto Club following Williams's threats, it would be impossible for Muller to return to work for Auto Club, although she was

fully able to work elsewhere. Accordingly, Dr. Brickman deemed Muller to be a "Qualified Injured Worker."

Dr. Brickman's final report resulted in an agreement between Klink, workers' compensation claims adjuster Diane Klatt, and Muller's workers' compensation attorney Randy Mason that Auto Club would provide Muller vocational rehabilitation services. Muller expressed a desire to "get out of the claims industry altogether." In November 1993 Klink told Muller she would be terminated after she completed her vocational rehabilitation. Muller completed her retraining in February 1994 and began working for Tool Time Construction as a bookkeeper on March 1.

During a visit to Auto Club's Escondido office on March 4, Muller was given a final paycheck and told she had been "resigned" from her position with Auto Club.

In June 1994 Muller filed a claim for harassment based on mental disability and medical condition with the California Department of Fair Employment and Housing (DFEH). She also filed a federal disability discrimination claim with the Equal Employment Opportunity Commission (EEOC). The EEOC investigator assigned to her claim informed Muller she was not a qualified individual with a disability under the Americans with Disabilities Act (ADA) (42 U.S.C. § 12101 et seq.).

After obtaining right-to-sue letters from EEOC and DFEH, Muller filed an action in federal court on July 25, 1994, for discrimination based on disability, harassment of a disabled individual, breach of contract, breach of the implied covenant of good faith and fair dealing, and wrongful termination in violation of public policy. On February 27, 1995, Muller filed the instant action in superior court, alleging the same causes of action.

In April 1995 Auto Club moved for summary judgment in the federal action as to all of Muller's claims. The federal court granted summary judgment as to Muller's ADA cause of action on the ground she was not disabled under the ADA. The federal court declined to exercise its discretionary jurisdiction over Muller's state law causes of action and, accordingly, dismissed them without prejudice.

On May 2, 1995, Muller filed a first amended complaint dropping the ADA cause of action adjudicated by the federal district court. Auto Club then successfully moved for summary judgment.

## DISCUSSION

■ On appeal from a ruling on a motion for summary judgment, the appellate court conducts its own independent review of the moving and

opposition papers and applies the same standard as the trial court in determining whether the motion was properly granted. The appellate court is not bound by the trial court's stated reasons for its ruling on the motion, as the appellate court reviews only the ruling and not its rationale. (*California Aviation, Inc.* v. *Leeds* (1991) 233 Cal.App.3d 724, 730-731 [284 Cal.Rptr. 687].)

I

*Claim for Disability Harassment Under FEHA*

The FEHA provides in pertinent part: "It shall be an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California: [¶] (a) For an employer, because of the . . . mental disability, [or] medical condition . . . of any person, to refuse to hire or employ the person . . . or to discriminate against the person in compensation or in terms, conditions or privileges of employment." (§ 12940.)[3]

In her FEHA cause of action entitled "Employment Harassment," Muller alleged she was harassed by coworkers at Auto Club because of her posttraumatic stress disorder. The court granted summary judgment on the ground all of her claims, including the FEHA cause of action, "are precluded by the exclusive remedies set forth in the workers' compensation statutes." The briefing on Auto Club's motion for summary judgment and the cases cited by the court in its ruling make it clear the ruling was based on Labor Code section 132a, which provides a remedy against employers who retaliate against workers for filing workers' compensation claims. The cases cited in the court's ruling support the proposition that Labor Code section 132a provides the exclusive remedy for employee claims of discrimination based on a work-related injury. (E.g., *Angell* v. *Peterson Tractor, Inc.* (1994) 21 Cal.App.4th 981, 988 [26 Cal.Rptr.2d 541].)

We do not address the issue of whether the exclusivity of Labor Code section 132a bars a claim under FEHA for work-related disability discrimination.[4] Rather, we conclude Muller's FEHA cause of action is without merit because she did not have a "mental disability" within the meaning of FEHA.

---

[3]Section 12940, subdivision (h)(1), makes it unlawful to harass an employee because of mental disability or medical condition.

[4]This issue is currently pending before the California Supreme Court, which granted review in two cases reaching contrary results as to whether a 1993 amendment to section 12993 eliminated Labor Code section 132a's preemption of FEHA claims for discrimination based on work-related injuries. (*Cammack* v. *GTE California Inc.* (1996) 48 Cal.App.4th 207 [55 Cal.Rptr.2d 837], review granted Nov. 26, 1996 (S056183); *City of Moorpark* v. *Superior*

Alternatively, we conclude, as a matter of law, that Muller was not the victim of harassment.

## A. *Muller Was Not Disabled*

Section 12926 defines the terms "physical disability" and "mental disability" as used in FEHA. Under that statute a physical malady does not qualify as a "physical disability" unless it "[l]imits an individual's ability to participate in major life activities." (§ 12926, subd. (k)(1)(B).) However, similar restrictive language does not appear in section 12926's definition of "mental disability." Section 12926, subdivision (i) merely states: " 'Mental disability includes any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities."[5]

Auto Club and the Employers Group, in its amicus curiae brief filed in this matter, contend the Legislature clearly intended to bring California's disability discrimination law into conformity with the ADA, which defines "disability" with respect to an individual as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; [¶] (B) a record of such impairment; or [¶] (C) being regarded as having such an impairment." (42 U.S.C. § 12102(2).) Auto Club and the Employers Group argue that to effectuate the legislative objective of conformity with the ADA, the term "mental disability" as used in FEHA must be construed as including only mental disorders that substantially limit one or more of a person's major life activities.

■ "When interpreting a statute, we must ascertain legislative intent so as to effectuate the purpose of a particular law. Of course our first step in determining that intent is to scrutinize the actual words of the statute, giving them a plain and commonsense meaning. [Citation.] When the words are clear and unambiguous, there is no need for statutory construction or resort to other indicia of legislative intent, such as legislative history. [Citation.] But language that appears unambiguous on its face may be shown to have a latent ambiguity; if so, a court may turn to customary rules of statutory construction or legislative history for guidance. [Citation.]

"Furthermore, we must assume that the Legislature has in mind existing laws when it enacts a statute. [Citation.] We must also interpret a statute in

*Court* (1996) 49 Cal.App.4th 973 [57 Cal.Rptr.2d 156], review granted Nov. 26, 1996 (S057121).)

[5]In addition to listing what the term "mental disability" *includes*, section 12926, subdivision (i) provides that the term *excludes* conditions excluded from the federal definition of "disability" in the ADA (e.g., kleptomania and pedophilia) as well as the unlawful use of controlled substances.

context, examining other legislation on the same or similar subjects, to ascertain the Legislature's probable intent. [Citation.] Therefore we may attempt to gain insight into the intended meaning of a phrase or expression by examining use of the same or similar language in other statutes. [Citation.] Statutory language which seems clear when considered in isolation may in fact be ambiguous or uncertain when considered in context. [Citation.]" (*Quarterman* v. *Kefauver* (1997) 55 Cal.App.4th 1366, 1371 [64 Cal.Rptr.2d 741].)

The definition of "mental disability" in section 12926 includes, without qualifying language, "emotional or mental illness." The terms "emotional illness" and "mental illness" can be broadly construed to include myriad temporary mental or psychological disorders that are not truly disabling because they do not impair any of the afflicted person's major life activities. Although section 12926, subdivision (i) may be unambiguous when read in isolation, viewed in the overall context of section 12926, it creates an ambiguity as to whether the Legislature intended to provide to employees with minor or temporary *mental* disorders protection that is denied to employees with minor or temporary *physical* disorders.

Further, section 12926, subdivision (i), is ambiguous when considered in the context of other legislation addressing disability discrimination. Section 12955.3, an FEHA statute concerning housing discrimination, defines "disability" as "[a] physical or mental impairment that substantially limits one or more of a person's major life activities." (§ 12955.3, subd. (a).) We can think of no good reason why the Legislature would define "mental disability" more broadly in the context of employment discrimination than in the context of housing discrimination.

In addition to section 12955.3, numerous other California statutes prohibiting disability discrimination, or otherwise protecting disabled persons, use the ADA definition of mental disability requiring substantial limitation of a major life activity. (See, e.g., §§ 11135, subd. (c), 19231, subd. (a)(1); Bus. & Prof. Code, §§ 125.6, 17206.1, subd. (b)(2); Civ. Code, §§ 54, 1761, subd. (g); Ed. Code, §§ 44101, subd. (b), 44337; Ins. Code, § 10144; Rev. & Tax. Code, § 24383, subd. (f).) The Legislature's use of the ADA definition of "mental disability" in so many other antidiscrimination statutes strongly indicates it intended it to apply in the context of FEHA's employment discrimination statutes as well. Because of the ambiguity regarding the meaning of "mental disability" in the FEHA employment statutes, we look to legislative history for guidance. (*Quarterman* v. *Kefauver, supra,* 55 Cal.App.4th at p. 1371.)

The definition of "mental disability" was added to section 12926 by Assembly Bill No. 1077, 1991-1992 Regular Session (Assembly Bill 1077) (Stats. 1992, ch. 913, § 21.3, p. 4306). The legislative history of that

provision is revealed through companion bills to Assembly Bill 1077. The definition of "mental disability" in Assembly Bill 1077 is substantially the same as that set forth in Assembly Bill No. 3825, 1991-1992 Regular Session (Assembly Bill 3825), which the Governor vetoed solely because it would have empowered the Fair Housing and Employment Commission to award unlimited emotional distress damages to victims of employment discrimination. The Assembly Committee on Labor and Employment re-. ported that Assembly Bill 3825 "[c]onforms state disability laws to the federal ADA in the area[] of employment . . . . Among its provisions, this bill specifically: [¶] Protects individuals with physical or mental disabilities from discrimination." (Assem. Com. on Labor and Employment, Analysis of Assem. Bill No. 3825 (1991-1992 Reg. Sess.) as amended Apr. 2, 1992, p. 5.) Noting California law provided less protection than the ADA against discrimination based on mental disability, the report stated: "Employers and providers of public accommodations or services will be required to comply with both the ADA and state laws and regulations. [¶] Without conformity, California businesses and employers will be required to comply with the varying standards in state law and ADA. Supporters argue that conformity with the ADA will benefit employers and businesses because they will have · one set of standards with which they must comply." (*Op. cit. supra,* at p. 8; accord, Sen. Com. on Judiciary, Analysis of Assem. Bill No. 3825 (1991-1992 Reg. Sess.) as amended June 19, 1992.)

A number of California's antidiscrimination statutes, including section 12926 and Civil Code section 54, were amended by the enactment of Assembly Bill 1077. The Assembly Committee on Judiciary noted Assembly Bill 1077 would conform California law to the ADA by modifying "the language contained in state anti-discrimination laws to ensure that protections are given to individuals with *physical or mental disabilities.* . . . Further, it changes terms such as 'physical handicap' found through state anti-discrimination provisions to terms found in the ADA such as 'persons with disabilities.' Disability is defined to mean: (a) a physical or mental impairment that substantially limits a major life activity, (b) a record of such impairment; or (c) being regarded as having such an impairment." (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1077 (1991-1992 Reg. Sess.) as amended Jan. 6, 1992, p. 2; see also Sen. Com. on Judiciary, Analysis of Assem. Bill No. 1077 (1991-1992 Reg. Sess.) as amended June 1, 1992.)

From this legislative history and the various antidiscrimination statutes cited above, it is clear the Legislature intended to conform California's employment discrimination statutes to the ADA by extending protection to persons with mental disabilities, and intended, in accordance with the

ADA, to uniformly define "mental disability" as a mental impairment that substantially limits a major life activity.[6]

The issue of whether Muller suffered a mental disability under that definition was adjudicated against Muller in her federal action. Therefore, Muller is collaterally estopped from relitigating that issue in the present case. (See *Lucido* v. *Superior Court* (1990) 51 Cal.3d 335, 341 [272 Cal.Rptr. 767, 795 P.2d 1223, 2 A.L.R.5th 995].)

In ruling on Auto Club's motion for summary judgment in the federal action, the federal district court noted: "The regulations promulgated by the EEOC to implement the ADA define 'major life activities' as 'functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.' [Citation.]" (*Muller* v. *Automobile Club of Southern California* (S.D.Cal. 1995) 897 F.Supp. 1289, 1294.)[7] The federal district court carefully reviewed Muller's evidence regarding her claimed mental disability and concluded it "fails to dispute [Auto Club's] evidence showing that [Muller's] psychological impairment was of limited duration and did not substantially limit a major life activity. . . . That the Williams incident 'impacted' [Muller's] life is insufficient to show a disability under the ADA. [¶] [Muller] falls especially short in her efforts to show a substantial limitation on her ability to work. [Muller] has

---

[6]The Fifth District recently concluded the Legislature intended to omit the language requiring limitation of a major life activity from the definition of "mental disability" in section 12926. (*Pensinger* v. *Bowsmith, Inc.* (1998) 60 Cal.App.4th 709 [70 Cal.Rptr.2d 531].) The *Pensinger* court declined to look beyond the language of section 12926 to determine legislative intent, citing the rule that there is no need for construction when the language of a statute is clear and unambiguous. *Pensinger* viewed the Legislature's amendment of the definition of "disability" in other statutes (e.g., Civ. Code, § 54; Gov. Code, § 11135) to mirror the ADA definition, including the requirement that the physical or *mental* disability substantially limits a major life activity, as evidence of its intent *not* to adopt the ADA definition of "mental disability" in section 12926.

We disagree with *Pensinger*'s conclusion there is no ambiguity regarding the definition of "mental disability" in section 12926 and that statutory construction is therefore unnecessary. Assuming no ambiguity is created by the language of section 12926 itself, an ambiguity is nevertheless created by the inconsistency between section 12926, subdivision (i) and the definition of mental disability in other statutes dealing with disability discrimination. "When a particular provision appears in one statute but is omitted from a related statute, the most obvious conclusion from the omission is that a different legislative intent existed. [Citation.] *On the other hand, an examination of legislative history and the pertinent statutory scheme may suggest that the omission was an oversight*." (*People* v. *Goodloe* (1995) 37 Cal.App.4th 485, 491 [44 Cal.Rptr.2d 15], italics added.) Based on our examination of the relevant legislative history and California's antidiscrimination legislation overall, we conclude the omission of the requirement of limitation of a major life activity from the definition of "mental disability" in section 12926, subdivision (i), was legislative oversight.

[7]The same definition of "[m]ajor life activities" is set forth in Civil Code section 1761, subdivision (g)(2) and Business and Professions Code section 17206.1, subdivision (b)(2)(B).

not pointed to any evidence showing that her psychological impairments prevented her from holding a job in the same class as the one she held at the Auto Club before her termination. That [Muller] did not want to return to the insurance industry does not demonstrate that her impairments met the standard for 'disability' under the ADA. [Muller] has offered no information about the availability in her area of claims adjuster jobs or other jobs requiring similar skills, training, and ability. [¶] In short, [Muller] has failed to point to evidence suggesting the existence of any genuine issue of material fact about whether she had an actual disability under [the ADA]." (*Muller* v. *Automobile Club of Southern California, supra,* 897 F.Supp. at p. 1297.)[8]

### B. *Muller Did Not Suffer From a "Medical Condition"*

Section 12926, subdivision (h) states: " 'Medical condition' includes any health impairment related to or associated with a diagnosis of cancer, for which a person has been rehabilitated or cured, based on competent medical evidence." Although the issue is not extensively argued, Muller contends section 12926 does not impose limits on the type of "medical conditions" contemplated by section 12940. Auto Club, on the other hand, contends "medical condition" in section 12926 covers only impairments related to successful recovery from cancer.

The word "includes" in section 12926, subdivision (h) creates an ambiguity. ▊ As this court has noted, " 'While the word "includes" may be used to broaden a specific term, it may also be used as a word of limitation.' [Citation.]" (*State Compensation Ins. Fund* v. *Workers' Comp. Appeals Bd.* (1977) 69 Cal.App.3d 884, 890 [138 Cal.Rptr. 509]; see also *Associated*

---

[8]Muller argued in federal court that even if she was not actually disabled, she was "disabled" under the ADA because Auto Club regarded her as having a disability. (*Muller* v. *Auto Club of Southern California, supra,* 897 F.Supp. at p. 1297.) The court noted that a "proper test for a 'regarded as' claim is 'whether the impairment, *as perceived,* would affect the individual's ability to find work across the spectrum of same or similar jobs.' [Citation.]" (*Id.* at pp. 1297-1298.) The court concluded: "[Muller] has failed to point to any evidence suggesting that [Auto Club] considered her disabled under the ADA. [Auto Club's] efforts to accommodate [Muller's] safety concerns and ultimately to help her find employment outside the Auto Club do not suggest that [Muller] has a valid 'regarded as' claim. [Muller's] workers' compensation attorney and a representative of [Auto Club] agreed that [Muller] should receive vocational training after Dr. Brickman stated that [Muller] could not return to her job at the Auto Club. By its actions, [Auto Club] never conceded that [Muller] was unfit for work as a claims adjuster or that [her] impairment, as perceived by [Auto Club], would preclude her from obtaining employment consistent with her training and experience. Instead, all of the evidence before this Court shows that [Auto Club's] efforts at accommodation were responses to [Muller's] own concerns about her safety and her wishes to enter a new line of work. [¶] In short, [Muller] has failed to raise a genuine issue of material fact about whether [Auto Club] regarded her as disabled under the ADA." (*Id.* at p. 1298.)

*Indemnity Corp.* v. *Pacific Southwest Airlines* (1982) 128 Cal.App.3d 898, 904 [180 Cal.Rptr. 685].) The governing consideration in resolving such an ambiguity is the intention of the Legislature. (*Coast Oyster Co.* v. *Perlus* (1963) 218 Cal.App.2d 492, 501 [32 Cal.Rptr. 740].)

The parties do not refer to any *express* indication of the Legislature's intention in specifying only a health impairment related to or associated with cancer in the definition of "medical condition" in section 12926, subdivision (h). However, we infer the Legislature intended to use the word "includes" as a word of limitation in subdivision (h) from its use of the word elsewhere in the statute. The Legislature clearly uses the word "includes" as a word of limitation in defining the following terms in section 12926: "affirmative relief" or "prospective relief" in subdivision (a); "employer" in subdivision (d) (see *American National Ins. Co.* v. *Fair Employment & Housing Com.* (1982) 32 Cal.3d 603, 611 [186 Cal.Rptr. 345, 651 P.2d 1151] (dis. opn. of Mosk, J.)); "employment agency" in subdivision (e); "labor organization" in subdivision (g); and "mental disability" in subdivision (i).

In defining "physical disability" in subdivision (k) and "sex" in subdivision (o) of section 12926, the Legislature makes clear its intent to use the word "includes" as a word of enlargement by adding the phrase "but is not limited to" after it. If the Legislature intended to extend FEHA protection to employees with medical conditions other than cancer, presumably it would have followed the word "includes" with the phrase "but is not limited to" in section 12926, subdivision (h). Not only is that phrase absent from the definition of "medical condition" in subdivision (h), but the Legislature specifically deleted it from the definition when it amended section 12926 in 1993. (Stats. 1993, ch. 1214, § 5.)[9]

Considering the Legislature's use of the word "includes" as a word of limitation throughout section 12926 except where it is followed by the phrase "but is not limited to," and the Legislature's specific deletion of that phrase from subdivision (h) in 1993, we conclude the Legislature intended to limit the definition of "medical condition" to "any health impairment related to or associated with a diagnosis of cancer, for which a person has been rehabilitated or cured, based on competent medical evidence." (§ 12926, subd. (h); see *Gosvener* v. *Coastal Corp.* (1996) 51 Cal.App.4th 805, 812-813 [59 Cal.Rptr.2d 339].) Accordingly, Muller's temporary stress disorder

---

[9]Prior to its amendment in 1992, section 12926, subdivision (f) stated: " 'Medical condition' *means* any health impairment related to or associated with a diagnosis of cancer, for which a person has been rehabilitated or cured, based on competent medical evidence." (Stats. 1990, ch. 15, § 1, p. 88, italics added.) In 1992 the Legislature amended section 12926 by, among other things, substituting "includes, but is not limited to" for "means" in subdivision (h). (Stats. 1992, ch. 911, § 3, pp. 4232-4233; ch. 912, § 3, p. 4250; ch. 913, § 21.3, p. 4307.) In 1993 the Legislature deleted the phrase "but is not limited to" as noted above.

does not constitute a "medical condition" within the meaning of sections 12926 and 12940.

## C. *Muller Was Not Harassed*

Assuming arguendo Muller suffered from a mental disability or medical condition within the meaning of section 12940, she fails to raise a triable issue of fact as to whether she was harassed.

There is no published California case addressing the requirements for a claim of harassment based on a mental disability or medical condition. Since Muller's theory is that she was subjected to a hostile work environment created by repeated harassing statements by management personnel, we look to cases addressing the requirements for a hostile environment claim of sexual harassment for guidance.

■ " 'For [hostile work environment] sexual harassment to be actionable, it must be sufficiently severe or pervasive "to alter the conditions of [the victim's] employment and create an abusive working environment." ' [Citation.]" (*Fisher* v. *San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 609 [262 Cal.Rptr. 842], quoting *Meritor Savings Bank* v. *Vinson* (1986) 477 U.S. 57, 67 [106 S.Ct. 2399, 2405, 91 L.Ed.2d 49].) "In determining what constitutes 'sufficiently pervasive' harassment, the courts have held that acts of harassment cannot be occasional, isolated, sporadic, or trivial, rather the plaintiff must show a concerted pattern of harassment of a repeated, routine or a generalized nature. [Citation.]" (*Fisher* v. *San Pedro Peninsula Hospital, supra,* 214 Cal.App.3d at p. 610.)

■ Muller's harassment claim is essentially based on two remarks made jokingly by her supervisor, Jack Lape, and a third remark made by a coworker. Lape asked Muller if she wore "her target" and, on another occasion, told her that he had informed Williams where she lived and what kind of car she drove. The only other remark Muller points to as supporting her harassment claim is that of a female coworker, who said to her, "I'm glad to see you're still alive." These isolated remarks cannot reasonably be viewed as "a concerted pattern of harassment of a repeated, routine or a generalized nature." Rather, they fall into the category of "occasional, isolated, sporadic, or trivial" instances of inappropriate conduct. Moreover, they cannot constitute harassment on the basis of Muller's mental disability or medical condition because they were made before Muller's disorder was diagnosed.

In addition to the aforementioned teasing remarks and accusation of insubordination, Muller testified in her deposition that her disability harassment claim was based on the fact Lape twice knocked on the door of the

room in which she was secluded on May 5 and asked her to come out to talk to Williams's father. She also felt harassed by receiving contradictory and confusing instructions from 17 different people regarding her workers' compensation claim; by an alleged directive from management to employees to direct any calls from Muller to management and not discuss anything with her; and by the fact Auto Club employees learned she had retained an attorney in her workers' compensation case. While these events may have been upsetting to Muller, they cannot reasonably be viewed as a concerted pattern of harassment. The court properly adjudicated Muller's FEHA cause of action in Auto Club's favor.

## II

### Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing

We have not addressed whether the exclusive remedy aspect of Labor Code section 132a[10] bars Muller from pursuing a remedy under FEHA for harassment or discrimination as result of a work-related injury because we have concluded Muller does not have a viable FEHA claim. However, we conclude the exclusivity of section 132a bars Muller's causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing.

Muller contends the exclusive remedy provisions of the Workers' Compensation Act (Lab. Code, § 3200 et seq.) do not bar her contractual claims because she seeks damages under those claims for economic injury independent of her mental injury, including prospective loss of earnings and medical benefits. Muller relies on *Pichon* v. *Pacific Gas & Electric Co.* (1989) 212 Cal.App.3d 488 [260 Cal.Rptr. 677], in which the plaintiff was suspended from work pending a psychological evaluation after he became emotionally distraught as a result of harassment by his supervisor. The plaintiff returned to work and was ultimately discharged for insubordination because he insisted his proposal for a bridge design was superior to that submitted by one of his supervisors. He then sued his employer for breach of an agreement to terminate for good cause only, breach of the implied covenant of good faith and fair dealing and intentional and negligent infliction of emotional distress. (*Id.* at pp. 492-493.)

The Court of Appeal in *Pichon* held that the plaintiff's emotional distress claims were barred by the exclusivity of workers' compensation but his

---

[10]All further statutory references in this section of the opinion are to the Labor Code unless otherwise specified.

contractual claims were not. *Pichon* concluded: "Economic or contractual damages incurred independent of any disability cannot logically be included in the concept of 'injury' in the sense of 'personal injury or death' [for which the Workers' Compensation Act provides the exclusive remedy]." (*Pichon* v. *Pacific Gas & Electric Co., supra,* 212 Cal.App.3d at p. 501.)

However, *Pichon* further stated: "Our decision should not be construed to hold that the exclusivity provisions of the Workers' Compensation Act can never preclude a wrongful termination claim because the injury sought to be redressed by such a claim is loss of employment, not a 'personal injury' or death. '[When] the essence of the wrong is personal physical injury or death, *the action is barred by the exclusiveness clause no matter what its name or technical form . . . .'* [Citation.] The crucial question is what is the nature of the actual underlying injury for which the former employee is trying to recover, not what cause of action is alleged." (*Pichon* v. *Pacific Gas & Electric Co., supra,* 212 Cal.App.3d at p. 501, italics in original.)

In *Usher* v. *American Airlines, Inc.* (1993) 20 Cal.App.4th 1520 [25 Cal.Rptr.2d 335], the plaintiff sued her employer for constructive termination and breach of contract based on the employer's alleged discrimination against her because she was temporarily disabled as the result of an industrial injury to her back and knee. (*Id.* at pp. 1522-1523.) Relying on *Pichon*, the plaintiff in *Usher* argued Labor Code section 132a does not provide for disability discrimination when the employer's conduct also breaches an implied employment contract. The *Usher* court stated it did "not read *Pichon* so broadly as to allow a separate action whenever an employee alleges that a work injury also resulted in a breach of contract." (20 Cal.App.4th at p. 1528.)[11]

The *Usher* court found *Pichon* distinguishable, stating: "The plaintiff in *Pichon* was fired for disagreeing with his supervisor, and injuries to his psyche followed. He was not terminated because of any physical or mental disability. Appellant claims that she was not allowed to work because of her industrially caused disability. This conduct was the basis for the 132a claim. Appellant has incurred no damages independent of the compensable workers' compensation claim. By her complaint and answers to interrogatories, she has admitted that the damages suffered were derived from discrimination based on an industrial injury and that she was disabled throughout the entire period of discrimination. The essence of this wrong is a personal injury sustained at work and lost wages because of the employer's discrimination against her due to her industrial injury. These matters are governed by the

---

[11]*Usher* and *Pichon* were decided by different panels of the First District Court of Appeal, Division One.

Workers' Compensation Act. Appellant cannot avoid the exclusive remedy provision by labeling this cause of action as breach of a contract. Unlike the plaintiff in *Pichon*, appellant can point to no damages that are not recoverable under section 132a. The contract cause of action is also barred by the Workers' Compensation Act." (*Usher* v. *American Airlines, Inc., supra,* 20 Cal.App.4th at p. 1528.)[12]

*Usher* is on point. Muller's contract claims are based on the same alleged discriminatory and harassing conduct as her disability harassment claim under FEHA. Whether that conduct was in response to Muller's anxiety disorder or her voicing of safety concerns as a result of the Williams incident, it arose from her alleged mental disability. The essence of the alleged harm in each of Muller's claims is the loss of wages and benefits as a result of her employer's harassment and discrimination on the basis of her work-related psychiatric injury. As *Usher* noted, these matters are governed by the Workers' Compensation Act.

Further, Labor Code section 132a provides an adequate remedy for the harm Muller claims under her contract causes of action. Muller seeks damages for loss of past and future earnings, job benefits, and expenses incurred in the search for comparable employment. Section 132a provides for a penalty of up to $10,000 in addition to reimbursement for lost wages and benefits. Section 132a also provides for reinstatement, which obviates the need for future earnings and job hunting expenses.

Muller cites *Bray* v. *Workers' Comp. Appeals Bd.* (1994) 26 Cal.App.4th 530 [31 Cal.Rptr.2d 580], for the proposition that workers' compensation exclusivity does not preclude her from seeking compensation for prospective lost earnings and benefits suffered after her termination. However, *Bray* merely held that the workers' compensation system does not provide compensation for *psychiatric* injuries arising after the termination as a result of the termination itself. (*Id.* at pp. 539-540.) *Bray* did not address Labor Code section 132a or whether workers' compensation exclusivity bars a civil action for breach of an employment contract that arises out of disability discrimination.

"[T]he Supreme Court has interpreted the broad policy language of section 132a to provide the increased workers' compensation remedies of section 132a for *any* discrimination against an employee based on a work-related

---

[12]To *Usher*'s analysis distinguishing *Pichon* we would add that *Pichon* addressed only the exclusive remedies of Labor Code sections 3600 and 3602 for work-related personal injury or death. *Pichon* did not address the exclusive remedy effect of Labor Code section 132a on a claim for breach of contract arising out of alleged disability discrimination.

injury. [Citation.]" (*Angell* v. *Peterson Tractor, Inc., supra,* 21 Cal.App.4th at p. 988.) Muller's causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing are barred by the Workers' Compensation Act because they seek damages arising out of alleged discrimination based on a work-related injury.[13]

In any event, although, Muller alleges various ways in which Auto Club breached her employment contract and the implied covenant of good faith and fair dealing, the gravamen of those causes of action is that Auto Club terminated her without good cause. Assuming there was an implied contract between the parties that Muller could be terminated for good cause only, uncontroverted evidence establishes that Auto Club had good cause to terminate her employment. Auto Club did not terminate Muller's employment until after her treating psychiatrist, Dr. Brickman, concluded she could not return to work at Auto Club, she was retrained to work as a bookkeeper, and Auto Club received notice that she had secured a position in her new field. Under these circumstances, Auto Club's termination of Muller's employment was for good cause as a matter of law.

The court correctly granted summary judgment as to Muller's contractual causes of action.

### III

### *Tortious Discharge in Violation of Public Policy*

■ To support a claim of tortious discharge in violation of public policy, the policy allegedly violated must be delineated in a constitutional or statutory provision. (*Gantt* v. *Sentry Insurance* (1992) 1 Cal.4th 1083, 1095 [4 Cal.Rptr.2d 874, 824 P.2d 680].) Muller contends her discharge violated the public policy against discrimination on the basis of disability delineated in Government Code section 12940 as well as the public policy promoting safety in the workplace and prohibiting employers from retaliating against employees who complain of unsafe working conditions, delineated in Labor Code sections 6402 and 6310, subdivision (b).[14]

Government Code section 12940 does not support Muller's tortious discharge claim, as we have concluded there is no merit to Muller's cause of

---

[13]We view harassment as a form of discrimination. (See Gov. Code, § 19572; *Meritor Savings Bank* v. *Vinson, supra,* 477 U.S. at p. 67 [106 S.Ct. at pp. 2405-2406]; *Reno* v. *Baird* (1997) 57 Cal.App.4th 1211, 1224-1227 [67 Cal.Rptr.2d 671] review granted December 17, 1997 (S065473).)

[14]Labor Code section 6402 provides: "No employer shall require, or permit any employee to go or be in any employment or place of employment which is not safe and healthful."

Labor Code section 6310, subdivision (b), provides, in relevant part: "Any employee who is discharged, threatened with discharge, demoted, suspended, or in any other manner discriminated against in the terms and conditions of employment by his or her employer

action under that statute. Nor is there merit to Muller's claim that she was discharged in retaliation for complaining of unsafe working conditions in violation of Labor Code section 6310.

"To establish a prima facie case of retaliation, a plaintiff must show that she engaged in a protected activity, that she was thereafter subjected to adverse employment action by her employer, and there was a causal link between the two. [Citation.]" (*Fisher* v. *San Pedro Peninsula Hospital, supra,* 214 Cal.App.3d at p. 614.)

There is no evidence in the record that Muller was subjected to unsafe working conditions in the Auto Club office where she worked. In her separate statement of undisputed facts in opposition to Auto Club's motion for summary judgment, Muller merely states she was "terminated *subsequent to* expressing concerns for her workplace safety and security." (Italics added.) She does not assert she was terminated *because* she expressed safety concerns. Assuming she meant her termination was retaliatory, the only relevant evidence she cites in support of that contention is her declaration in which she states she was frightened for her safety, conveyed her fear to management employees and requested that various measures be taken to accommodate her fear, including removing her name tag from her desk cubicle, locking two of the three doors accessing her work area, and notifying her coworkers about the Williams incident. She also asked about the possibility of hiring a security guard for the building and having cameras installed outside the building.

Obviously, Muller's anxiety disorder did not overnight render her office an unsafe workplace. There is a certain risk of crime in any workplace to which the general public has access. However, unless crime in the workplace is highly foreseeable, employers cannot reasonably be expected to insure against it. As one court stated: "Sadly, in these days of increased urban crimes of violence, such crimes can also occur in the workplace, just as they do in the street. However, there is no fundamental public policy requiring a retail employer to provide adequate store security; to the contrary, there is a 'well-established policy' against forcing landowners to insure public safety. [Citation.]" (*Arendell* v. *Auto Parts Club, Inc.* (1994) 29 Cal.App.4th 1261, 1265 [35 Cal.Rptr.2d 83].)

---

because the employee has made a bona fide oral or written complaint to . . . his or her employer . . . of unsafe working conditions, or work practices, in his or her employment or place of employment . . . shall be entitled to reinstatement and reimbursement for lost wages and work benefits caused by the acts of the employer. Any employer who willfully refuses to rehire, promote, or otherwise restore an employee or former employee who has been determined to be eligible for rehiring or promotion by a grievance procedure, arbitration, or hearing authorized by law, is guilty of a misdemeanor."

The voicing of a fear about one's safety in the workplace does not necessarily constitute a complaint about unsafe working conditions under Labor Code section 6310. Muller's declaration shows only that she became frightened for her safety as a result of her unfortunate experience with Williams and expressed her fear to Auto Club; it is not evidence that the Auto Club office where she worked was actually unsafe within the meaning of Labor Code sections 6310 and 6402. Hence, Muller's declaration fails to raise a triable issue of fact as to whether she was terminated for complaining to Auto Club about unsafe working conditions in violation of Labor Code section 6310.

The court properly adjudicated Muller's cause of action for tortious discharge in violation of public policy in favor of Auto Club.

## DISPOSITION

The judgment is affirmed.

Work, Acting P. J., and McDonald, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 27, 1998.